# HOUSTON A. HUNT *v.* STATE OF MARYLAND

[No. 513, September Term, 1970.]

*Decided June 23, 1971.*

288

The cause was argued before MURPHY, C. J., and ORTH and GILBERT, JJ.

*Robert Allen Sapero* for appellant.

*James L. Bundy, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, Julian B. Stevens, Jr., State's Attorney for Anne Arundel County, Samuel A. Green, Jr., State's Attorney for Baltimore County,* and *Gary Huddles* and *Stuart E. Hirsch, Assistant State's Attorneys for Baltimore County,* on the brief, for appellee.

ORTH, J., delivered the opinion of the Court.

Barbara Jean Stec, 21 years of age, said that she had been kidnapped by members of a motorcycle club called The Heathens. Although various members of the club participated in the crimes by being present in a position

to aid and abet, at the least,[1] Houston A. (Foggy) Hunt was her principal tormentor. She and Janet Couch, with whom she shared an apartment, and Janet's boy friend had gone to the Club DeVille about 11:00 P.M. on 18 April 1969. Hunt had forced her to leave the Club DeVille with him. For the next several days she was in the company of The Heathens against her will. She was forcibly taken to various places in Maryland, including Hunt's residence and The Heathen's clubhouse, driven to Delaware, returned to Maryland, plied with dope, beaten and raped. She escaped in the early afternoon of 22 April and called her former boss at the County Bar, Tony Panatti, from a telephone booth on Holabird Avenue. He called the police.

As a result of her allegations the Grand Jury for Baltimore County returned a true bill against Hunt and eight others — Gilmer P. (Jeeter or Mother Cheater) Crane, Chester (Animal) Gabriszeski, Hurley L. (Dum Dum) Fickus, Paul Leonard (Tramp) Sprinkle, George (Jungle) Janowiak, Patrick (Baby Huey) Hill, Mark Allan (Crazy) Fox and Walter Joseph (Tiny) Kennedy. Upon suggestion the indictment was removed to Anne Arundel County and tried before a jury in the Circuit Court in that jurisdiction. Only Hunt was convicted. The jury found him guilty of kidnapping Barbara, forcibly carrying her within Maryland (1st count), and out of Maryland (2nd count), assaulting her (5th count), and falsely imprisoning her (6th count).[2] He was sentenced to a total of 46 years—20 years under the 1st count and two terms to run consecutively thereto of 20 years, 1 year and 5 years respectively under the other counts. He appealed. His sixteen claims of prejudicial error run the gamut of the trial from the selection of the jury to the sentences imposed and include along the way, the

1. See *Agresti v. State*, 2 Md. App. 278, 280.
2. The other counts charged kidnapping with intent to conceal the victim within the State (3rd count) and with intent to conceal her without the State (4th count).

conduct of the trial judge, the admission of evidence, closing arguments of the prosecutors, sufficiency of the evidence and merger of offenses.

The defense was that the criminal aspects of Barbara's story were a complete fabrication. The defendants adduced evidence from some eighteen witnesses that Barbara willingly went with Hunt and other members of The Heathens, declining an invitation of one Nicholas Thomas (Piggy) Charney, not a member of The Heathens, and with whom she had danced, to leave the Club DeVille with him.[3] Contrary to her claim of being raped, she willingly went to a second floor bedroom with Hunt and when she came back to the first floor living room told another girl, Joyce Peay, that "Foggy couldn't satisfy her." Later when they returned from Delaware[4] and were all in the clubhouse of The Heathens, she sat on a sofa with Hunt "trying to arouse" him again. She was successful and they copulated right then and there in the presence and within the view of the gathering.[5] Nor was she compelled at any time to remain with Hunt or other members of the club or to go anywhere with them, doing both freely and voluntarily. She agreed to wear and did in fact wear Hunt's "colors", his jacket

3. Piggy testified: "I says 'Barbara, I'm going to go to Brooklyn [Anne Arundel County]', I says 'You want to go down with us, you know, come on', she says 'No, I'll go with them', I says alright and I left." Asked if she was forced to go with them, he said, "No, Sir, because they walked out the door just before we did, and—uh—I mean like I'm a pretty big boy and if I'd of seen, you know, anybody forcin' her or anything I'd come to—helped her in some sort—."

4. The trip to Delaware was to attend a meeting in contemplation of The Heathens merging with another club, The Pagans.

5. Even according to the version of the events offered by the defense Barbara's sexual activities were confined to Hunt. She was not in the "train", although she said that she was threatened with being put through the "train" if she did not submit to Hunt. It seems that a girl is in the "train" when a number of men in succession have sexual relations with her. There was testimony that one girl in the group, Patricia Meachum, was in the train while Barbara was with the group and Patricia admitted when she testified for the defense that she had willingly been involved in the train. It would seem that coitus in the presence of other members is practiced as within the mores of the group.

with "Property of Foggy" emblazoned on the back.[6] On the evening of 21 April the group ended up at Hunt's house. While listening to records the lights were turned out and everybody "sort of dozed off." The next morning Barbara was gone. They "were sort of laughing at [Hunt] because Barbara left and didn't tell him anything." It was denied that during Barbara's sojourn with the Heathens she took dope.

## THE SUFFICIENCY OF THE EVIDENCE

We resolve first the question of the sufficiency of the evidence to sustain the convictions. It is before us on the denial of a motion for judgment of acquittal made at the close of all the evidence. The test is whether the evidence either showed directly or supported a rational inference of the facts to be proved from which the trier of fact could be convinced, beyond a reasonable doubt, of the defendant's guilt of the offense charged. *Williams v. State,* 5 Md. App. 450, 459. The basis of Hunt's contention, and properly so on the posture of the evidence, is that the State's case stands or falls on the testimony of the victim.[7] He claims that it must fall since her testimony had no probative value because of the inconsistencies in it, relying on *Kucharczyk v. State,* 235 Md. 334. We do not find the holding of *Kucharczyk* to be applicable. Barbara's testimony was not so contradictory within itself as to preclude the consideration of it. See *Poff v. State,* 3 Md. App. 289. Such inconsistencies as were in it only went to its weight and to her credibility. These matters, as well as contradictions to her testimony presented by the testimony of other witnesses and other evidence, were properly to be resolved by the jury. See

---

6. It appears that it is the custom in the social stratum represented by The Heathens for a girl to so advertise that she belongs at the moment to one of the group.

7. He states in his brief: "The State presented its case in chief through one material witness, the purported victim as well as nine other relatively unimportant witnesses."

*Bailey v. State,* 6 Md. App. 496; *Eley v. State,* 4 Md. App. 230. Thus the lower court did not err in submitting it to them, for if the jury believed Barbara, her testimony provided evidence meeting the test. Therefore, we find the evidence sufficient in law to sustain the convictions and hold that the lower court did not err in denying the motion for judgment of acquittal.

## THE JURY

### *The Voir Dire Examination*

The court, as it may, elected to conduct the examination of prospective jurors itself and itself submitted additional questions suggested by Hunt's counsel as it deemed proper. Maryland Rule 745. Hunt now contends that the court erred "in preventing defense counsel from asking additional *voir dire* questions for cause." According to the transcript of the proceedings what occurred was that after the examination of the prospective jurors on their *voir dire* had been concluded, Hunt's counsel said, "I would like to ask an occasional question for voir dire purposes of specific individuals, information, that is, to their background which is not indicated in the sheet which gives their names and for whom they work. I would first like to ask an occasional question." The court said it would ask a prospective juror whether he was married and his occupation. "That's all I'll do." We see no error in the refusal of the court to grant counsel's vague request for blanket permission to ask "an occasional question" of specific but undesignated individuals concerning "their background." See *Carder v. State,* 5 Md. App. 531; *Curtis v. State,* 4 Md. App. 499; *Day v. State,* 2 Md. App. 334.

### *The Striking of Juror No. 11*

After twelve jurors and two alternate jurors had been selected, Juror No. 11 informed the court that he knew the man sitting in the courtroom with Barbara Jean

Stec.[8] "I don't know the girl, I know him." The court asked, "Alright, would that affect you in rendering a fair and just verdict in this case?" Juror No. 11 replied, "I'm afraid so, I know him real well, he's from Curtis Bay." Although the transcript does not expressly so state, from later developments it appears that this colloquy between the court and Juror No. 11 took place at the bench out of the presence of the defendants and their counsel. The court announced:

> "Mr. Bathgate, who is Juror Number 11, says that he does know the person who is sitting alongside of Barbara Jean Stec in the balcony, and that such knowledge would prevent him from rendering a fair and just verdict in this case. In this case, the Court has no alternative but to strike him on its own motion. You are excused, sir. Alternate Juror Number 1, you will move in to Number 11. Alternate Juror Number 2 will now become Alternate Juror Number 1. Gentlemen, there is the necessity for selecting an additional alternate Juror."

Hunt's counsel, receiving permission to approach the bench, moved for a mistrial "because of the commentary regarding Juror Number 11." The court asked him if the mistrial was moved on the grounds "that Mr. Bathgate's reason for asking to be disqualified as Juror Number 11 was stated in open court" and counsel answered "Yes." Asked why that would prejudice his client, counsel said:

> "I think that it was probably inappropriate to speak to the Juror out of the presence of counsel and also that the following commentary that he knew the person sitting next to the girl and then was taken out indicates the knowledge of

8. During the *voir dire* examination Barbara Jean Stec was introduced to the prospective jurors and they were asked if they "personally knew her or any member of her family."

someone with the girl and in the presence of other prospective Jurors, I believe it would be prejudicial. That sums it up."

The motion for mistrial was denied. We think the denial proper. We can conceive of no prejudice to Hunt by reason of the striking of Juror No. 11 in open court and the announcement by the court of the reason therefor. We observe that counsel neither below nor in the brief on appeal stated with specificity the prejudice he believed accrued by the court's action. Nor do we feel in the circumstances that the colloquy between the court and Juror No. 11 denied Hunt either his right to be present at all stages of the trial or his right to representation by counsel. We do not think that this communication between the court and the Juror was a stage of the trial. See *Young v. State,* 5 Md. App. 383, construing *Midgett v. State,* 216 Md. 26. In any event, the court immediately made known to Hunt and his counsel what the Juror had communicated to him and action was taken on the communication in the presence of both of them. We find it clear from the record that the communication was not prejudicial and had no tendency to influence the verdict of the jury. *Saul v. State,* 6 Md. App. 540; affirmed on certiorari, *State v. Saul,* 258 Md. 100, is not factually apposite.

## The Challenge to the Array

As Alternate Juror No. 1 replaced Juror No. 11 and Alternate Juror No. 2 became Alternate Juror No. 1, a second alternate juror was selected. There were no further preemptory challenges or challenges for cause made by the prosecution or defense. The prospective jury and the two alternates were asked if there was any reason they may have that would prevent in any way the rendering of a fair and just verdict; they had no reason. The transcript reads: "Clerk swears in jury." The court gave the jury comprehensive admonitions concerning discussion of the case, and receiving information

about it from outside sources. It explained the routine expected to be followed in the trial and the function of the alternate jurors. The transcript then reads, "(Jury is sworn and indictments read.)" [9] After luncheon recess court resumed out of the presence of the jury to entertain motions. Hunt's counsel challenged the array.[10] He based the challenge on two grounds: 1) the exclusion from juries of persons under the age of 25 years, and 2) the excusing of persons from jury service by the Jury Commissioner for the Circuit Court for Anne Arundel County.

(1)

At the time of the trial Code, Art. 51, § 1 provided: "No person shall be selected and placed upon a panel as a juror who shall not have arrived at the age of twenty-five years." [11] Also at the time of trial § 5-500 of the Anne Arundel County Code (Michie 1967) provided for the preparation and the filing by the clerk to the county council with the clerk of the Circuit Court of a list of all taxable residents of the county whose names appear on the tax books "and who are not known to the clerk or

---

9. We do not know whether the jury were in fact twice sworn. In any event it is immaterial if they were. And if they were not it is immaterial whether they were sworn before or after the court's remarks to them.

10. The court said:

"I might mention that counsel did bring this up as an issue this morning when twelve prospective Jurors filled the box, although they had not been sworn as yet, this was raised in chambers and I advised counsel at that time that I would permit him to raise this issue after the Jury and the alternates had been selected and sworn."

We point out that Maryland Rule 744 b provides, "A challenge to the array shall be made and determined before any individual juror from that array is examined." That the court permitted Hunt to make the challenge untimely cannot be said to prejudice him. See *Hicks v. State*, 9 Md. App. 25.

11. The section and other sections regarding qualification and selection of juries were repealed by chapter 408, Acts 1969. Under the terms of the Act a plan for random jury selection was submitted by the Circuit Court for Anne Arundel County on 27 August 1969 and approved to be effective 1 January 1970 by order of the Court of Appeals of 6 October 1969. It seems that under the plan the 25 year age limitation is eliminated and those old enough to vote may serve.

to the council to be under the age of twenty-five years."
A jury panel was picked from this list and other sources,
including the poll books of the several councilmanic dis-
tricts. Hunt claims that the elimination of those under
25 years of age deprived him of equal protection of the
law. We do not agree. Assuming that those under 25
years of age were eliminated from the jury in Hunt's
trial we see no constitutional infirmity. There is nothing
unreasonable in requiring a juror to be at least 25 years
old. There must be some cut-off point and Hunt does not
explain, nor do we see, why equal protection is denied
at a 25 years of age cut-off but afforded, as he seems to
suggest, at a 21 years of age cut-off. See *Britton v.
Bullen*, 275 F. Supp. 756 (4th cir.). Nor do we find any
merit in the argument that to be a jury of his peers the
jurors must be the approximate age of the defendant
before them. In any event we do not find evidence suf-
ficient to establish that those under 25 years of age were
excluded from the jury here due to a systematic policy
rooted in prejudice. See *Borman v. State*, 1 Md. App.
276. We note that the provisions of Art. 51, § 1 are di-
rectory, rather than mandatory, *Hollars v. State*, 125
Md. 367, and there is no evidence that some prospective
jurors were excluded as under 25 years of age at the
mere whim or caprice of the selecting authorities. And
we do not feel that the rationale of cases holding uncon-
stitutional systematic exclusion because of race or re-
ligion is applicable to the issue here. See *Brooks v. State*,
3 Md. App. 485; *Grayson v. State*, 1 Md. App. 548.

### (2)

The Jury Commissioner for Anne Arundel County,
called by Hunt, testified as to the procedure followed in
drawing a jury panel. She said that some persons were
excused by reason of financial and physical hardship. For
example, women who have no transportation, mothers
unable to obtain baby sitters for their young children,
and those impaired by ill health may be excused. Hunt
concludes from her testimony that she alone determined

whether or not a prospective juror should be excused from serving. He claims that it is a judicial function to assure that the jury panel consists of 300 names of citizens of the County, fairly and impartially selected, with special reference to the intelligence, sobriety and integrity of such persons, *Anne Arundel County Code,* § 5-501, and that the Jury Commissioner usurped the authority of the judge. We do not think that the testimony of the Jury Commissioner established that she had the final determination as to who was to serve and who was to be excused. Although she talked in terms of "we" and sometimes "I" we believe it implicit from what she said that any final action taken was under the direction of the jury judge. But in any event the evidence did not establish a constitutional infirmity in the selection of the persons which comprised Hunt's jury. Even if the statutory requirements were not strictly followed it is evident from all her testimony that the objective in the selection procedure was to get persons of intelligence, integrity, and sobriety. See *Loker v. State,* 2 Md. App. 1, 15. The lower court characterized the procedure as followed "to ensure a Jury that is able to comprehend what is going on before it and ably physically to understand what the court takes to be the rigors of the jury trial itself." We cannot say from the record here that Hunt was foreclosed from obtaining a fair trial by an impartial jury of his peers. We agree with the lower court that his contentions were without merit. We hold that it did not err in denying the challenge to the array.

## PRESENCE AT TRIAL OF THE VICTIM'S PARENTS

When the trial was about to begin all witnesses were excluded from the courtroom at the request of the State. Rule 753. At a bench conference Hunt's counsel requested that the parents of Barbara Jean Stec be excluded from the courtroom although they were not to be called as witnesses for either the prosecution or the defense. The reason given was "so there cannot be a communication as to what is going on in this court * * * I

don't want the communication between the parents and their daughter about this —." The court in denying the request said that it would admonish all persons in the courtroom not to communicate with any of the witnesses or prospective witnesses. It did so in plain words, expressly including relatives of witnesses. The court did not err in the refusal of the request on the ground advanced, which in any event Hunt appears to have abandoned on appeal. Now Hunt presents a different ground. He claims prejudice because Juror No. 11 told the judge he knew the man seated next to the victim and that man and the woman next to him were the victim's parents. "That juror was excused but the fact of the parent's presence in the courtroom thereafter and the fact that a reputable juror knew the parent of the alleged victim was implanted in the remaining juror's minds. Further, during the trial, the parents sat apart from the rest of the gallery in such a manner that attention would be drawn to them. Due to the above factors it was impossible for the defendant to receive a fair trial by an impartial jury." This point was not tried and decided below and is not before us. Rule 1085. The record does not disclose that at the trial objection was made to the place in which the parents sat in the courtroom. We find the allegation of prejudice to be unsupported and without substance.

## THE ADMISSION OF EVIDENCE

### The Affidavit for the Issuance of a Search Warrant

During the cross-examination of Barbara by counsel for Sprinkle, he asked if she appeared before Judge Maguire, an Associate Judge of the Circuit Court for Baltimore County, on 23 April. She said that she had. It was then elicited through questions asked of her that she made an affidavit. She was shown a document and asked to identify it. She identified it as a photo-copy of the affidavit she had signed. She was asked if what was stated in the affidavit was all true and she said it was. Nu-

merous questions about specific statements in the affidavit were directed to her, including whether what was set out in the affidavit accurately represented what she had said. She was then asked to explain alleged discrepancies between her testimony at trial and the statements in the affidavit. At one point when defense counsel purported to repeat what was said in the affidavit the State objected on the ground that the affidavit did not so say. The court was shown the affidavit and sustained the objection, permitting counsel to rephrase his question. Counsel then read from the affidavit and asked the witness if that was her statement. He then pressed her on the issue whether the statement in the affidavit was correct or incorrect. In short, Barbara was examined by the defense at great length and fine detail on the representations made by her in the affidavit. The affidavit was in support of a search and seizure warrant of Hunt's residence. Although it was not formally introduced in evidence by the defense it was, by the reference to it under the circumstances, before the jury as fully as if it had been so introduced. And even though the cross-examination was conducted by Sprinkle's counsel, Hunt's counsel interposed no objection whatsoever. When the cross-examination of Barbara by all counsel was completed, the State moved the admission of the affidavit. It does not appear from the record before us that Hunt's counsel objected but even if he did we see no prejudicial error in its formal admission. In the light of the extent to which its contents were placed before the jury by the defense, the jury were entitled to consider the affidavit itself.

*The Extra-judicial Statement of Paul Fischer*

On cross-examination by counsel for Grabriszeski, Paul Fischer, a witness called by the State, was asked: "Mr. Fischer, as a result of what you observed and have testified to this morning, regarding the incidents of April the 19th, you were taken to Baltimore County Detective Bureau to reduce that to writing, were you not?" He answered in the affirmative. It was then elicited that he had

been interviewed by a Detective Neuner on 24 April and gave a statement which was reduced to writing and signed by him. He was shown a photostatic copy of that statement and identified it as a copy of the document he had signed. Then with the suggestion that his memory was "a lot fresher" on 24 April than at the time of trial, he was asked to explain differences between specific assertions in the statement and his testimony and attempted to do so. For example, he was referred to his testimony relating to a ride in an automobile with members of The Heathens. "You were asked whether the girls in the car—did the girls in the car say or do anything in your presence? Well, they talked but I don't know what they were talking about. Well, in your answer on the 24th you said, 'No, they just sat quiet * * *', now did they or did they not say anything to you?" Fischer replied, "Not to me they didn't say anything, no. They were — * * * they seemed real quiet. The person that was talking was mostly Foggy." The State took over the witness on redirect. It asked if the statement defense counsel had shown him was the one he made to the police. Hunt's counsel objected and there was a bench conference. The jury was sent to the jury room. The State offered in evidence the statement made by Fischer to the police on 24 April. Over continuing objection Fischer was referred to the second question on page 5 and requested to read it to the court. It was "Did the girls in the car say or do anything in your presence?" The answer to the question was read, "No, they just sat quiet the one girl with the brown hair and glasses acted like she was moving real slow as if she was under some type of influence. I did see two of the males drinking wine." The State offered the original of the statement. Hunt's counsel argued that the statement was inadmissible as an attempt by the State to impeach its own witness and as placing something in evidence on redirect examination which could not have been introduced on direct examination. Counsel for other defendants also objected and argued. The court ruled:

> "All right, the Court has considered the state-
> ment and had an opportunity to peruse its con-
> tents and the Court's ruling is that it will per-
> mit the State to ask the witness to read the bal-
> ance of the statement that he gave with re-
> sponse to the girls in car to which reference
> was made by Mr. Friedman during cross-ex-
> amination. However, it rules that the entire
> statement shall not be submitted to the Jury and
> that it is not competent evidence in its entirety."

In the presence of the jury the question in the statement with respect to the girls in the car talking was read to Fischer and he was asked if he remembered that question being asked of him. He said he did. The Assistant State's Attorney then said, "And this was your answer [reading it] is that correct?" Fischer replied, "Yes, sir, I'd say that was correct."

Without citation of authority, Hunt now contends that this "procedure was grossly leading, was a variation of impeachment by the State of its own witness and was totally improper." We do not agree. Counsel for Gabris-zeski, on cross-examination and with no objection from counsel for Hunt, read part of the answer given in the statement in the presence of the jury. We see no re-versible error in the State following this up by intro-ducing the balance of the answer. "The offer in testi-mony of a part of a statement or conversation, upon a well established rule of evidence, always gives the op-posite party the right to have the whole." *Walters v. State,* 156 Md. 240, 243. The jury then had the answer given to the question by Fischer in his testimony at trial and the entire answer to the question as given the po-lice, a part of which was brought out by the defense. The State was entitled to adduce the complete answer and the jury were entitled to consider it in determining what occurred and assessing the credibility of the witnesses.

*The Photograph of Hunt*

Dennis Goldberg testified on behalf of the State that

he had seen Barbara and some of the defendants at The Heathens' clubhouse. He had difficulty in making judicial identifications of the defendants as those he had seen because they were clean-shaven at trial — "Their hair is pretty short. They're cleaned up" — and when he saw them before "they were dirty, long hair and everything." He was shown nine photographs and selected four as photographs of men he had seen with Barbara. Of the four he made a judicial identification of Chester (Animal) Gabriszeski. Barbara was shown one of the photographs selected by Goldberg. She identified it as that of Hunt. She said it represented "an accurate description" of Hunt at the time of the offenses. The State offered the photograph. The procedure followed in showing the photographs to Goldberg in open court was clearly not impermissibly suggestive. Hunt's claim on appeal that it had no probative value has no merit; it went to his criminal agency. Further proof tending to establish Hunt's connection with Barbara was not inadmissible because a prior witness had identified him as being present with her at the clubhouse. The photograph may have been "gruesome" as stated in Hunt's brief but that did not render it inadmissible; it was an accurate depiction of his appearance at the time the crimes were committed. A procedure comparable to that here was followed in *Holmes v. State*, 10 Md. App. 253 to establish criminal agency and was not found by us to be improper. We hold that the admission of the photograph of Hunt was proper. It follows that the court did not err in denying Hunt's motion for a mistrial predicated on the recall of Barbara to identify the photograph as that of Hunt.

*The Testimony of Lenadell Large*

Nicholas Thomas (Piggy) Charney testified for the defense. During his examination he said he had met the members of the motorcycle club, "not personally but from ridin', you know, seein 'em every once in awhile." He had never joined the club. They were friends of his friend Robert Ingram. On 18 April 1969 at the Club De-Ville where the incidents involving Barbara Stec and

Hunt began, Ingram asked him if he wanted to go to a party. "I said — 'I don't care', you know, 'It's Friday night and I'm game, nothing doesn't matter to me', so like he came over and showed me some of the guys and said, 'How are you doing?' you know. They introduced me to some of the guys and they said this is so-and-so and this is so-and-so * * * whatever their nicknames are." He judicially identified Hunt, Kennedy, Crane, Fickus and Janowiak as being there but his identifications were far from positive. He thought that about six of The Heathens and two of their girls were there.

After the defense had rested the prosecution called Lenadell Large. She said she knew Tramp, Animal, Baby Huey, Foggy and Jungle. She could not remember the names of the other defendants but had seen them before. From that point on her testimony was subject to continual objection to which the stock reply of the prosecution was "It's rebuttal." She said she had last seen the defendants about six months ago [12] and had met them through Hunt with whom she was then living. She lived with him about a month, the relationship terminating 27 March. She knew Piggy (she thought his last name was Charles) and had last seen him several months before shooting pool in Troy's Bar in Essex. She identified a photograph of Nicholas Charney as that of the man she knew as Piggy. She was asked if she had ever seen Hunt and "these people" in conversation. She said, "Yes, it was about — it was in March. It was right after a killing —." There was objection and the court told the jury to disregard the last statement. It was then elicited from her that the conversation took place in Hunt's house. Baby Huey, Dum Dum and Jungle were present. She was asked what the conversation was about. There was objection as being improper rebuttal. The court said it would let the answer in subject to exception. She said, "Baby Huey was reading the paper, newspaper, about a

12. As she testified on 1 October 1969 and as the date of the offenses was 22 April 1969, she had last seen them about 3 weeks before the offenses were committed.

killing in New York and it was one of The Pagans or Heathens or something —." Hunt's counsel objected on the ground of relevancy and the objection was overruled. She continued "—and Baby Huey had said that he'd like to get * * * in touch with Piggy and that was all I heard." At a bench conference a defense counsel moved to strike the testimony of Large and requested that the jury be instructed to disregard it. The State answered the objection by again characterizing the testimony as in rebuttal. The court said, "I don't know the full import of all this. As a matter of fact, I'm greatly mystified by the last witness." The State offered an explanation. "You [defense counsel] brought out through Charney that he did not know any of The Pagans, they didn't know him. * * * The witness brought out 'that they — that Baby Huey, at least knew who Piggy was.' * * * There's no connection between The Heathens and The Pagans and Piggy * * * and yet before this incident even occurred, Baby Huey, at least, knew who Piggy was." One defense counsel said he thought it clear that the purpose "was to get out about the killing in The Pagans." The Assistant State's Attorney denied this. The court said, "Well, I'm going to leave it in for whatever it's worth. I refuse any request to strike it out." Hunt now claims the court erred.

Piggy Charney was an important witness for the defense. His testimony tended to show that Barbara had willingly left the Club DeVille with Hunt and the other Heathens. The probative value of his testimony was greater when viewed with his assertion that he was not a member of the motorcycle club and had not met the members personally although he had seen them "every once in awhile." He was introduced to them by Ingram at the Club DeVille on 18 April. The testimony of Lenadell Large, on the other hand, tended to contradict his claim that he had no close association with members of The Heathens; Baby Huey Hill wanted to get in touch with Piggy when he read about a matter concerning The Heathens or The Pagans and so said in the presence of

other members of The Heathens.[13] We hold that the challenged testimony of Lenadell Large was relevant and that there was no prejudicial error in admitting it as rebuttal.

### The Testimony of John Charney and Eston Scott

Hunt contends that the testimony of John Charney and Eston Scott, offered by the State in rebuttal, was "a calculated presentation by the State of irrelevant, leading and misleading inflammatory testimony and absolutely prejudicial."

Charney said he was the brother of Piggy. He was shown a photograph of Robert Ingram. He said the man in the photograph looked familiar but was not the man who came to his place. He did not know Robert Ingram.

Detective Eston Scott was recalled by the State in rebuttal. He simply identified a photograph shown him as that of Robert Ingram, a witness in the case.

This testimony of John Charney and Scott may have been irrelevant but we cannot say that its admission, even if erroneous, compels reversal for we see no prejudice to Hunt.

## THE CLOSING ARGUMENT OF THE PROSECUTION

Counsel presented arguments to the jury. No objection was made during argument by the State nor immediately thereafter. Then the court charged the jury. Rule 756 e. At the conclusion of the charge after discussion by counsel and court regarding the instructions, Hunt's counsel said in response to the court's inquiry whether there was anything else from counsel: "Only to say, your Honor, that I do — I've had no opportunity before, but I would take severe objection to comments made by the Prosecutor in his closing, for the record." Asked by the court what specific comments he had in mind, counsel

---

13. It seemed clear that the "Piggy" Hill mentioned was Nicholas Thomas Charney. Lenadell Large identified a photograph of Charney as the man she knew as Piggy and as the only one she knew "in The Heathens" who was known as Piggy.

said: "Comments relating to the fact that the State's Attorney's office, and he, himself, were the ones that stand behind this prosecution as such, and also I believe he is, in fact, as a result of this injected himself into the prosecution of this case." The court thought it a fair comment under the circumstances and denied a motion for a mistrial. The record does not disclose further objection before the jury retired to deliberate its verdict. Hunt alleges in his brief that "the court and counsel had discussed the ground rules for the closing arguments in chambers, and it was thoroughly understood by counsel for the appellant that there were not to be any interruptions during closing arguments. Objections were to be made upon the completion of the instructions by the court." The record is silent as to an understanding for this rather unusual procedure but even if this was the agreement there was objection directed only to "comments relating to the fact" that the State's Attorney's office and the prosecutor stood behind the prosecution. Only this objection, so expressed in vague terms and without specificity despite the court's request to counsel to state the specific comments he had in mind, was in any event timely made to the prosecutor's concluding argument covering about 20 pages when transcribed. See *Chandler v. State,* 7 Md. App. 646, 656. It is the only objection properly before us. Rule 1085. The primary defense of each defendant was that Barbara's story was a lie in its criminal aspects because she participated freely in the events of the several days with The Heathens. In so arguing to the jury defense counsel referred to the prosecutors. At one point defense counsel said the prosecutors were "attempting to dazzle the jury with footwork." One of defense counsel said he was explaining why certain things were not as the Assistant State's Attorney "tried to make you believe." At another point he remarked, *"I think that one of the things [the prosecutor] said was true* was that there really isn't too much difference between the story that was told by Barbara Stec and the story that was told by the defendants." (em-

phasis supplied) The implication was that the prosecutor had said things that were not true. In his argument the prosecutor answered by stating that he did not elicit perjury, did not suborn perjury and did not hide evidence. The defense had strongly questioned the State's failure to call Tony Panatti, whom Barbara had telephoned upon her escape. The prosecutor took full responsibility for not calling that witness, stating that it was his opinion the testimony would have been simply cumulative. He concluded his argument by remarking that the preceding Saturday the Governor of Maryland had spoken at a testimonial dinner for the State's Attorney for Baltimore County and during the course of his speech had remarked that the Baltimore County State's Attorney's Office "is well known for its pursuit of justice within the realm of justice. It's well known that the Baltimore County — and these are the Governor's words — that the Baltimore County State's Attorney's Office are prosecutors and not persecutors." The prosecutor then concluded his argument in these words: "I don't care what these men look like. I don't care how these men dressed. I don't care what these men do. I don't care what their jobs are. I don't care what their families are like. I don't care what their personal feelings are on any topic. I don't care whether they agree or disagree with me on anything. But when they have the audacity and the gall to take someone forcibly and against her will where she doesn't want to go, then it's time for action, and that's what we proceeded to do in this case." Assuming that the comments of the prosecutor set out above are those to which defense counsel had reference in his objection we see no abuse of discretion in the lower court's denial of a mistrial, the only action requested to be taken. See *Matthews v. State,* 3 Md. App. 555. Without approving the reference to the Governor's speech, we cannot say that it appears that the jury were actually misled or were likely to have been misled or influenced to the prejudice of Hunt by the remarks of the prosecutor. Compare *Holbrook v. State,* 6 Md. App. 265, 270.

Thus reversal of the judgment is not justified. Other objections to the State's arguments as set out in the brief are not considered as not properly before us.

## THE CONVICTIONS

Hunt claims that he was illegally convicted "of kidnapping out of the State of Maryland." His point is that Maryland would not have jurisdiction to prosecute a kidnapping out of the State. Code, Art. 27, § 337 provides, *inter alia,* a person "who shall be convicted of forcibly or fraudulently carrying or causing to be carried out of or within this State, any person * * * with intent to have such person carried out of or within this State * * * shall be guilty of a felony." The provisions of the statute become clear by reference to the common law crimes of kidnapping and false imprisonment. False imprisonment was the unlawful confinement of a person, the two essentials being (1) the detention of the person, and (2) the unlawfulness of such detention. Kidnapping was a false imprisonment aggravated by conveying the victim out of the country. Thus kidnapping was the forcible abduction or stealing of a man, woman or child from his own country and sending him into another. *Perkins on Criminal Law* (1957) ; pp. 129-137 ; Hochheimer, *Criminal Law,* (1st Ed.) § 624, p. 363 and § 686, p. 406; IV Blackstone *Commentaries,* ch. xv, p. 219. It is therefore apparent that the legislative intent in enacting Art. 27, § 337 was to broaden the common law crime of kidnapping to include the forcible or fraudulent carrying or intent to carry a person within the State as well as without. But false imprisonment is still a common law offense in this State and is distinguished from kidnapping; a "carrying away" is not an element of false imprisonment. *Midgett v. State,* 216 Md. 26, 38-39. The statute obviously does not apply to a kidnapping *committed* in another State and is not "an unlawful extension of State's (sic) criminal jurisdictional powers contrary to the Due Process Clause of the Fourteenth Amendment

of the United States Constitution." Hunt's claim that it is unconstitutional is without merit.

*MERGER*

Hunt claims error in the failure of the lower court to merge the convictions of assault (5th count) and false imprisonment (6th count) into the convictions of kidnapping (1st and 2nd counts). It is correct, as the court instructed the jury, that "assault is a necessary ingredient in the crime of kidnapping" and so assault must be found before there can be a conviction of kidnapping. But here there was evidence from which the jury could have found that Hunt assaulted Barbara independent of any assault incident to the kidnapping itself. Barbara testified that while in Hunt's apartment he was importuning her to have sexual relations with him. "I told him to leave me alone, to get away from me and I was pushing him and he was pushing me and he struck me." He grabbed her arm and pulled her in the bedroom and threw her down on the bed. These acts of assault and battery were not an element of the kidnapping but a separate and distinct offense. We hold that there was no merger of the 5th count into the convictions under the 1st and 2nd counts. See *Tender v. State*, 2 Md. App. 692. Compare *Massey v. State*, 7 Md. App. 615.

On the other hand we think that the false imprisonment here merged into the conviction of kidnapping. We have seen that kidnapping at common law was false imprisonment aggravated by carrying the victim out of the country. At common law and under the Maryland statute, false imprisonment is a necessary element to kidnapping. In proving the statutory kidnapping, false imprisonment is also proved, for the victim is unlawfully detained whether he is carried or intended to be carried within or without the State. We hold under the modern doctrine of merger that the 6th count merged into the convictions under the 1st and 2nd counts.

The next inquiry is whether it was proper that Hunt

be convicted both of forcibly carrying Barbara out of and within Maryland. We do not believe it was. We think that the legislative intent, as above suggested, was to make kidnapping include both a carrying within and a carrying out of the State, so distinguishing it from the common law. The crime of false imprisonment remains punishable at common law, committed by an unlawful detention absent a carrying. We do not feel that the legislature intended each act of carrying within Maryland stemming from the same abduction to be a separate and distinct offense. By the same token we do not feel that the legislature intended that a carrying out of the State after a carrying within the State, each aggravating an initial unlawful detention, were to be twice punished as separate and distinct offenses. Thus when a false imprisonment is aggravated by a carrying within the State, followed by a carrying out of the State, only one crime of kidnapping is committed and a conviction of carrying within the State and a conviction of carrying out of the State would be duplicitous. We set aside the judgment under the 2nd count.

Our holding disposes of the contention that the total of 40 years resulting from consecutive sentences on the convictions under the 1st and 2nd counts exceeded the maximum sentence of 30 years authorized by the Statute proscribing kidnapping.

## A FAIR TRIAL

Hunt contends that he did not receive a fair trial. He complains that the State did not produce medical evidence establishing that the victim was abused, or a physician's report relating to her alleged rape, or physical evidence such as torn clothing, spectacles broken when he allegedly struck her, narcotics, weapons and other items, or the testimony of Tony Panatti to whom the victim first complained, or the testimony of Piggy Charney who was last with her before the kidnapping. Much of this evidence would have been available to Hunt upon proper

procedures and could have been produced by him had he thought it helpful. Piggy Charney was called by him and testified on his behalf. We do not find a denial of a fair trial by the failure of the State to make these matters a part of its case. There is no allegation that the State concealed any evidence. Other matters of which Hunt now complains were not preserved for review or, in our consideration of his other contentions, have been found not to have been improper or prejudicial or cannot be said to derogate a fair trial. We hold that Hunt was not denied a fair trial.

We note that the practical effect of our holdings in disposing of the questions presented, some of which have been considered under one heading, is that Hunt is subject to a total term of 21 years rather than the 46 years imposed.

*Judgments under the first and fifth counts affirmed; judgment under the second count reversed as duplicitous with that under the first count; judgment under the sixth count vacated, the conviction thereunder merging into the conviction under the first count.*