754 A.2d 1030

**Terran PITTMAN, a Minor, etc., et al.**

**v.**

**ATLANTIC REALTY COMPANY et al.**

**No. 103, Sept. Term, 1999.**

Court of Appeals of Maryland.

July 12, 2000.

**516**

Saul E. Kerpelman (Saul E. Kerpelman & Associates, on brief), Baltimore, for petitioners.

Thomas J. Cullen, Jr. (Heather Doherty Clark of Goodell, DeVries, Leech & Gray, LLP, on brief), Baltimore, for respondents.

Argued before BELL, C.J., and ELDRIDGE, RODOWSKY, RAKER, WILNER, CATHELL and HARRELL, JJ.

RODOWSKY, Judge.

The issue presented in this lead paint case is whether a trial court has discretion to strike affidavits, submitted in response to a motion for summary judgment, after the deadline for discovery under the circuit court's scheduling order has passed, when the factual content of those affidavits varies from what the nonmoving party previously had furnished in discovery. The Court of Special Appeals in *Pittman v. Atlantic Realty Co.*, 127 Md.App. 255, 732 A.2d 912 (1999), applied the rule found in a number of federal court decisions that allows a trial court in some circumstances to disregard as a "sham" an affidavit in opposition to a motion for summary judgment. As explained below, we do not adopt the sham affidavit rule. Accordingly, we reverse.

I

Terran Pittman (Terran) was born December 18, 1990. From birth until 1996 Terran lived with his mother, Shari Hall (Hall), and his grandmother, Gladys Hall, principally at 1805 Harlem Avenue in Baltimore City. In November 1992 Terran first tested positive for elevated lead levels in his blood. Hall testified on deposition that the Harlem Avenue property contained chipping paint. That property was owned by the Housing Authority of Baltimore City (HABC), a co-defendant below which was voluntarily dismissed.

Sometime in 1992, due to a disagreement with her mother, Hall and Terran left the Harlem Avenue premises and stayed

nearby with a family friend, Rita Porter (Porter), at 1908 Lauretta Avenue in Baltimore City (the subject premises). At some undetermined time in 1993, Hall and Terran returned to Harlem Avenue and resided again with Gladys Hall. Both before and after residing with Porter, Hall and Terran visited Porter at the subject premises. These premises were owned by Atlantic Realty Company and managed by Northern Brokerage Co., defendants below and respondents in this Court (Respondents).

A lead paint violation notice was issued to Atlantic Realty Company for the subject premises on August 12, 1993. Hall testified on deposition that the subject premises contained paint chips and that she frequently saw Terran put them in his mouth. Terran continued to test positive for moderate to high lead levels between December 1993 and November 1995. He had his first normal-range reading in January 1996.

In June 1994 Terran and his mother (Petitioners) instituted the present action, joining the Respondents and alleging that Terran had been injured due to exposure to lead in the paint at the subject premises. Petitioners prayed for a jury trial. In March 1995 the Circuit Court for Baltimore City entered a scheduling order requiring, *inter alia*, that all discovery be completed by March 22, 1996, that "[a]ny supplementation of discovery or continuation of deposition shall be concluded no later than" March 18, 1998, and that "[a]ll depositions of experts shall be completed no later than March 18, 1998." [1]

---

1. Maryland Rule 2–504, effective October 1, 1994, provides in section (b)(1) the required contents of a scheduling order:
 "(1) Required. A scheduling order shall contain:
 "(A) an assignment of the action to an appropriate scheduling category of a differentiated case management system established pursuant to Rule 16–202;
 "(B) one or more dates by which each party shall identify each person whom the party expects to call as an expert witness at trial, including all information specified in Rule 2–402(e)(1)(A);
 "(C) one or more dates by which each party shall file the notice required by Rule 2–504.3(b) concerning computer-generated evidence;
 "(D) a date by which all discovery must be completed;
 "(E) a date by which all dispositive motions must be filed; and

During the discovery period, Respondents attempted to learn how long Hall and Terran resided at the subject premises and how often they visited the subject premises both before and after residing there. The variance between the information furnished by Petitioners in discovery and the affidavits submitted in opposition to Respondents' motion for summary judgment concerns the amount of time that Terran spent at the subject premises.

## II

### A. Answers to Interrogatories

In reply to Respondents' interrogatory seeking the addresses and dates where Hall and Terran resided, she answered: "1908 Lauretta Avenue 1992–1993." The periods for Hall's previous and subsequent residence at Harlem Avenue, with her mother, were listed respectively as 1990–1992 and 1993–1996. In a separate answer, Hall stated that she "moved into [the subject premises] with ... Porter approximately spring/summer of 1992." In reply to an interrogatory concerning day care, propounded by HABC, Hall responded that Terran "was cared for at [the subject premises] by Rita Porter, during the hours of 8:00 a.m. through 4:00 p.m., Monday through Friday." The period during which this arrangement was in effect was not stated.

### B. Hall's Deposition

At her deposition taken on February 27, 1997, Hall's answers concerning how long she and Terran resided with Porter at the subject premises, and how often she visited there with Terran, were vague, confused, and inconsistent.[2] In brief, Hall testified that she and Terran lived at the subject premises for the following periods, defined by different mea-

---

"(F) any other matter resolved at a scheduling conference held pursuant to Rule 2–504.1."

**2.** An extensive excerpt of Hall's testimony is provided as an appendix to this opinion.

sures of time, and presented here in the order of her testimony: "[a]bout a month"; "[a]bout two weeks. Two months I mean"; "[f]or about two months"; for a time "in the fall, probably"; for a time beginning when her son "was two . . . [o]r getting ready to turn two. It was somewhere around that area"; for a time ending "close to a holiday because I had to buy [Terran] an outfit. . . . It might have been Easter or the Fourth of July. I'm trying to think. Because it was spring when I was around there. Easter is in the spring, right? Right"; for a time beginning "before [Terran's] birthday [in December 1992]"; for a time comprising "January, February [1993], because it wasn't too bad outside"; "[a]bout two months"; "about two months, because I know how many times I gave [Porter] some money for rent money." Finally, in response to the question whether "two months is the maximum that you lived with [Porter]," Hall answered, "Right, yes." "[T]wo months" is Hall's predominant and, arguably, final answer. One also can infer from this testimony, however, that she resided at the subject premises from December 1992, when her son turned two years old, until Easter 1993, or approximately four months.[3]

With respect to visiting the subject premises from the time Terran was born until he was four years old, as contrasted with residing there, Hall testified as follows: "here and there, [Porter] baby-s[a]t [Terran]"; "[Porter] lived right around the corner from us, so I would stop in there quite often. . . . [P]robably like twice out of a week or something like that, out of a month, who knows. I'd just drop in, you know." Hall said that Porter never babysat Terran "on a regular basis." In addition, Hall testified that, when she moved back to Harlem Avenue, she and Terran visited the subject premises

---

**3.** Gladys Hall also was deposed on February 27, 1997. She testified that Terran was one year old when she asked her daughter to leave, that this occurred in the summer, that her daughter and Terran went to live with Porter at the subject premises, and that they resided there "[a] couple of months, as far as I could tell." Thus, Gladys Hall's deposition testimony adds nothing more favorable to Petitioners' case than the arguably final deposition answer of Hall herself.

"[a]bout three or four times a week"; "[w]henever [Gladys Hall] had something to drink ... [which was] constantly"; at any time of day, whether "[e]vening, mornings, didn't matter"; for "two hours, three hours, maybe an hour [at a time]"; that she "never stopped going to see [Porter, just] because I moved back with my mom. I still go to see her."

In sum, with respect to Terran's exposure to lead paint while visiting at Porter's, the evidence most favorable to the Petitioners is that he visited the subject premises twice a week before residing there and three to four times a week for up to three hours at a time after residing there.

## C. Deposition of Dr. Klein

Howard Klein, M.D. (Dr. Klein), Petitioners' expert on the causal relation between Terran's exposure to lead paint and lead paint poisoning, was deposed by the defendants.[4] Initially, Petitioners' counsel referred Dr. Klein to Hall's answers to interrogatories, including the answer that Hall and Terran resided at the subject premises between 1992 and 1993, that they moved there in the spring/summer of 1992, and that Terran was cared for by Porter at the subject premises "during the hours of 8:00 a.m. through 4:00 p.m., Monday through Friday" with dates unspecified. When asked whether, based on this information, he had an opinion "within a reasonable degree of medical probability, as to whether or not Terran Pittman was exposed to lead-based paint at [the subject premises]," Dr. Klein testified that "if that information is correct, he was [exposed]."

Later, Respondents' counsel redirected Dr. Klein's attention to both Hall's deposition and answers to interrogatories, ask-

---

**4.** It is the plaintiff's burden in a lead paint case to prove that the "defendant's conduct was a substantial factor in causing the injuries." *Bartholomee v. Casey*, 103 Md.App. 34, 56–57, 651 A.2d 908, 918 (1994) (citing Restatement (Second) of Torts § 431 (1965)), *cert. denied*, 338 Md. 557, 659 A.2d 1293 (1995). *See also Casey v. Grossman*, 123 Md.App. 751, 761, 720 A.2d 959, 964 (1998) (noting that *Bartholomee* adopted the "substantial factor" rule for lead paint injury), *cert. denied*, 353 Md. 269, 725 A.2d 1068 (1999).

ing for the basis of his opinion that "a major contributor to . . . this young boy's problems, [was] from lead exposure at [the subject premises]." Dr. Klein replied:

"Well, one of the problems is that although I have a Baltimore City Health Department inspection record of [the subject premises] and we know that he continued to have elevated levels well past '93, it's basically the answer to interrogatories that talks about the child being there. I mean I don't have any other, as I mentioned to you in previous questioning, I don't have any other source for that information."

When defense counsel, assuming two months to be the longest period of residence stated in Hall's deposition, asked:

"[Terran's] there for two months, that's the worst case scenario, according to her answers, two months. Do you really believe that you can say, to a reasonable degree of medical certainty, that his problems, a major contributor of his problems, is the lead at [the subject premises], where he could have stayed approximately two months?"

Dr. Klein replied: "It's unlikely." Finally, redirecting Dr. Klein to Hall's interrogatory answers, defense counsel initiated the following exchange:

"Q . . . [T]he answer I'm reading to [Dr. Klein] is that, 'Other than 1805 Harlem Avenue, the minor plaintiff was cared for at [the subject premises] by Rita Porter during the hours of 8 AM through 4 PM, Monday through Friday.' Does that have any significance to you without some sort of date or time frame or context? Was that one week? Was it in 1995? Do you have any idea when that was?

"A That's why I can't give you medical probability and that's why I'm saying that it's unlikely that this was a major contributor.

"Q Even based on these responses [to the interrogatories], though, too, isn't that right?

"A That's why I answered as I answered."

In sum, Dr. Klein acknowledged on deposition that, without any time frame, he could not state with a reasonable degree of

medical probability that lead exposure at the subject premises was a "major contributor" to Terran's injuries. Dr. Klein was able to opine, however, that a two months residence was an insufficient period of exposure to be a substantial factor in causing Terran's injuries.

### D. Motion for Summary Judgment

On April 20, 1998, Respondents moved for summary judgment, citing those portions of Dr. Klein's deposition in which he stated that it would be difficult to render an opinion as to substantial factor causation, and that such causation was "unlikely" based on two months residence at the subject premises.

In response, Petitioners filed their answers to interrogatories and the entire depositions of Hall, Gladys Hall, and Dr. Klein. In addition Petitioners produced new affidavits from each of those three witnesses. These affidavits were signed on May 7, 1998, and filed the next day in court, more than one year after Hall's deposition and almost two months past the scheduling order's deadline for concluding all supplementation of discovery and all expert discovery. Gladys Hall swore in her affidavit that her daughter and grandson moved from Harlem Avenue "[i]n approximately the spring or summer of 1992," and resided at the subject premises "until December of 1992." She thereby tripled or quadrupled the "couple of months" to which she had testified on deposition.

In Hall's affidavit, she swore in pertinent part as follows:

"3. From the time Terran Pittman was born until 1994, I constantly visited my friend Rita Porter at her residence, [the subject premises]. I would visit this residence on an every day basis from approximately 2:00 p.m. in the afternoon until approximately 9:00—10:00 p.m. in the evening. During these visits Terran Pittman would always be with me at [the subject premises].

"4. Occasionally, I would go to another location, however, I would leave Terran Pittman with Rita Porter for her to baby-sit him.

"5. In the spring or summer of 1992, I was in a disagreement with my mother, Gladys Hall. Terran Pittman and I moved out of her residence at 1805 Harlem Avenue and moved in with Rita Porter at [the subject premises]. We stayed at this address for approximately five and one-half months.

"6. Terran Pittman and I moved back into 1805 Harlem Avenue with my mother in approximately December 1992. We still spent every day visiting at [the subject premises] for approximately eight hours every day. We did this until Rita Porter moved from [the subject premises] in 1994."

Furnished with a then stationary factual platform of five and one-half months residence, plus over three years of visiting "on an every day basis" for seven to eight hours a day, Dr. Klein, expressly assuming the truth of the new affidavits, opined in his May 7 affidavit that exposure at the subject premises was a substantial causal factor in Terran's lead poisoning.

Respondents moved to strike these affidavits. They contended that Hall's new affidavit contradicted her deposition testimony of a maximum residence of two months duration. If one looks at other deposition answers by Hall, the new affidavit also shifts the residence period from December 1992 through Easter 1993 to spring/summer 1992 through December 1992. The new Hall affidavit also contradicts Hall's deposition testimony that she would "just drop in" on Porter twice a week before residing with her and three to four times a week for up to three hours at a time after residing there.

Neither the Hall nor the Gladys Hall affidavits presented any explanation for the variances from the prior evidence given by the respective witnesses.

### E. Circuit Court Judgment

The circuit court granted the motions to strike and for summary judgment. The court reasoned that statements in the affidavits of Hall and Gladys Hall constituted "significant changes" that "contradict[ed] testimony [Hall] presented in

deposition," and that "the process of discovery can become subverted ... if by the mere presentation of an affidavit constructed more than a year after the presentation of deposition testimony, a witness can so dramatically alter her evidence." Without the new affidavits, the Respondents were entitled to summary judgment on the ground that Petitioners could not meet their burden of showing that exposure to lead paint at the subject premises was a substantial causal factor in Terran's injuries.

### F. Court of Special Appeals

The Court of Special Appeals affirmed. It characterized the affidavits as "contain[ing] information which contradicted both the previously elicited interrogatory answers of Terran's mother and her deposition testimony," as "lengthen[ing] the child's period of residence at [the subject premises] to 5–1/2 months," and as "untimely filed" because submitted "nearly two months [after] the deadline for the completion of discovery." *Pittman*, 127 Md.App. at 265–66, 732 A.2d at 917. The court noted that "[i]f Ms. Hall had erroneously stated the periods of residence, visits, and baby-sitting in her deposition, she had ample opportunity to amend her answers, to clarify these dates, and to provide this information to [Respondents]." [5] *Id.* at 268–69, 732 A.2d at 919. Thus, the court

---

5. Hall waived reading and signing of her deposition. If she had not so waived and had the transcript of the deposition been submitted to her, any corrections that Hall desired to make would have been limited to those made "to conform the transcript to the testimony." Maryland Rule 2–415(d). Further, Maryland Rule 2–401(e), imposing the duty on "a party who has responded to a request or order for discovery and who obtains further material information before trial [to] supplement the response promptly," does not apply in the case of a deposition. Consequently, there is no direct, formal mechanism under the Maryland Rules of Procedure for altering, before a trial, the substance of an answer given on deposition, even if the new information is based upon a genuine change of recollection. The implications of this feature of the Maryland Rules in the case before us are discussed in Part VII of this opinion.

By way of contrast Fed.R.Civ.P. 30(e) provides that, where the deponent reviews the deposition transcript, "if there are changes in form or *substance*," the deponent is "to sign a statement reciting such

affirmed the exclusion of the affidavits on the ground of "unfair surprise." The court also adopted a rule of federal caselaw (the sham affidavit rule) according to which "a party may not defeat summary judgment by offering an affidavit which contradicts unambiguous testimony previously elicited during a deposition." *Id.* at 267, 732 A.2d at 918 (citing *Darnell v. Target Stores*, 16 F.3d 174, 176–77 (7th Cir.1994); *Barwick v. Celotex Corp.*, 736 F.2d 946, 959–60 (4th Cir.1984); *Van T. Junkins & Assocs. v. U.S. Indus., Inc.*, 736 F.2d 656, 657–59 (11th Cir.1984)). The Court of Special Appeals affirmed the grant of summary judgment because, without the affidavits, Petitioners could not meet their burden of establishing "the necessary element of 'substantial causation.'" *Id.* at 270, 732 A.2d at 920. We granted certiorari in order to determine whether to adopt the federal rule. *Pittman v. Atlantic Realty Co.*, 356 Md. 495, 740 A.2d 613 (1999).

### III

In this Court the Petitioners argue that the federal decisions applied by the Court of Special Appeals are contrary to Maryland law because they violate the rule prohibiting a court from deciding on summary judgment issues involving the credibility of witnesses that are for resolution by the factfinder at trial (the credibility rule). *See Berkey v. Delia*, 287 Md. 302, 332, 413 A.2d 170, 185 (1980). Petitioners further submit that Maryland Rule 2–501 ("Motion for summary judgment") gives them the right to file an affidavit in opposition to a summary judgment motion. Alternatively, Petitioners assert that the new affidavits merely supplement and clarify the prior discovery. On the other hand, Respondents urge that we adopt the federal rule, asserting that it is consistent with summary judgment procedure, that deposition testimony is inherently more reliable than affidavits, and that the sham affidavit rule preserves the integrity of scheduling orders.

---

changes and the reasons given by the deponent for making them." (Emphasis added).

Both parties argue that adoption of the position of the other will encourage deceptive practices in discovery.

## IV

The text of Fed.R.Civ.P. 56 ("Summary Judgment")[6] does not definitively address how a trial court should treat an affidavit, submitted in response to a motion for summary judgment, that contradicts prior deposition testimony.[7] This issue was first addressed explicitly by judicial decision in *Perma Research & Development Co. v. Singer Co.*, 410 F.2d 572 (2d Cir.1969).

In that case Perma sued Singer alleging that Singer had entered a contract to perform certain product assembly services for Perma with no intention to perform and that Perma therefore was entitled to recision. *Id.* at 573–74. On deposition, Perma's president, Perrino, could provide no particularized evidence of Singer's fraud and admitted that the parties had been working together to solve the problems in the product until Singer ceased performing. *Id.* at 576. Singer moved for summary judgment based on Perrino's deposition, and, in opposition, Perrino submitted an affidavit in which he

---

**6.** Fed.R.Civ.P. 56(c) provides simply that "[t]he judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the [accompanying] affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(g) does allow for sanctions against a party who has submitted an affidavit "in bad faith or solely for the purpose of delay."

**7.** *See* E. Brunet, *Summary Judgment Materials,* 147 F.R.D. 647, 664–65, 667 (1993) (defining a "sham affidavit" as those "disregarded by courts because of their blatant inconsistency when compared to prior unequivocal deposition testimony," and noting that in this situation "the court's actions are basically discretionary," and that "Rule 56 fails to speak directly to the matter of inconsistent evidence proffered by a party"). *But see* J.J. Duane, *The Four Greatest Myths About Summary Judgment,* 52 Wash. & Lee L.Rev. 1523, 1601 (1995) (arguing that disregarding a contradictory affidavit violates Fed.R.Civ.P. 56(e) because that rule sets forth detailed requirements for an affidavit, *e.g.,* that it be made on "personal knowledge," but does not include a requirement of consistency).

swore that one of Singer's agents told him that " 'Singer never had any intention of performing' " the subject contract. *Id.* at 577. The court noted that this allegation "contradict[ed]" statements made in the depositions, including, for example, Perrino's assertion that there was " 'no way of me knowing exactly what [Singer's] intention was at the time they said it' " and his admission "that there had been substantial performance." *Id.*

Although it noted authority for the contrary position,[8] the Second Circuit affirmed summary judgment for the defendant because, "[w]hile [the affidavit] would appear to raise a triable issue as to fraudulent intent, we think that [the district court judge] could properly conclude that the statement made in the affidavit was less reliable than the contradictory statements in the deposition, and that it did not raise a triable issue of fraud." *Id.* (citation omitted). Pointing out that Perrino was a party to the conversation alleged in the affidavit and so could not "complain of non-access to material facts," and that the contradiction between the deposition and affidavit could not be explained by the acquisition of newly discovered evidence, the court reasoned:

> "If a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact. Compare *Engl v. Aetna Life Insurance Co.*, 139 F.2d 469 (2d Cir.1943), where [the trial court] observed that a party who resists summary

---

**8.** *See Perma,* 410 F.2d at 578 (" 'Nevertheless [*i.e.,* despite the greater reliability of deposition testimony, which is subject to cross-examination], if a witness has made an affidavit and his deposition has also been taken, and the two in some way conflict, the court may not exclude the affidavit from consideration in the determination of the question whether there is any genuine issue as to any material fact.' " (quoting 6 Moore, *Federal Practice* § 56.22[1], at 2814 (2d ed.1965))). The current version of this treatise recognizes the federal rule. *See* 11 *Moore's Federal Practice* § 56.14[1][f], at 179 (Matthew Bender 3d ed. 1997) ("If a party's deposition and affidavit are in conflict, the affidavit is to be disregarded unless a legitimate reason can be given for the discrepancies.").

judgment cannot hold back his evidence until the time of trial."

*Id.* at 578 (citation omitted).

■■■■ Stated strictly, the *Perma* rule is that, if an interested party has personal knowledge of the relevant facts, and if that party cannot explain a material contradiction between deposition testimony and a subsequent affidavit by the acquisition of newly acquired evidence, then a trial court may disregard the affidavit as a "sham," *i.e.,* as one failing to "raise[ ] any issue which [the trial court] can call genuine." *Id.* The *Perma* court advanced three rationales for this rule: (1) a trial court may evaluate deposition testimony as more reliable than an affidavit because the former is subject to cross-examination; (2) a trial court may disregard a contradictory affidavit because otherwise the utility of the summary judgment procedure, as a process for screening out sham claims, always could be defeated; (3) it is unfair to allow a party to generate an issue of material fact by means of "inconsistent statements made by [that party] the deponent and [that party] the affiant." *Id.* Respectively these justifications may be referred to as the reliability, utility, and fairness rationales.[9]

---

**9.** *See* M. Holley, *Making Credibility Determinations at Summary Judgment: How Judges Broaden Their Discretion While "Playing by the Rules,"* 20 Whittier L.Rev. 865, 880–81 (1999) (setting forth these rationales as the "reliability," "utility," and "fair play" rationales and criticizing each of them as inconsistent with the credibility rule).

The *Perma* court did not use the word "fairness," or any other term, to characterize the third rationale. It also is possible to characterize this rationale as one of estoppel, by analogy to the doctrine of judicial estoppel. The application of judicial estoppel requires: (1) the assertion of a factual "position inconsistent with that taken in prior litigation"; (2) that the "prior inconsistent position must have been accepted by the court"; and (3) that "the party sought to be estopped must intentionally have misled the court to gain unfair advantage." *Sedlack v. Braswell Servs. Group, Inc.,* 134 F.3d 219, 224 (4th Cir.1998). Although judicial estoppel ordinarily applies to positions taken in prior litigation, prior and current litigation are somewhat analogous to the discovery and post-discovery phases of a single action. Moreover, the purpose of the judicial estoppel doctrine is arguably applicable to the summary judgment context, namely, to "prevent a party from 'playing fast and loose' with the courts and [to] 'protect the essential integrity of

The Second Circuit's *Perma* rule has been adopted by most other circuits.[10] Some later cases have refined the rule by

---

the judicial process.' " *Id.* (quoting *Allen v. Zurich Ins. Co.*, 667 F.2d 1162, 1166 (4th Cir.1982)). The Respondents in the instant matter have not raised judicial estoppel.

**10.** *See Martin v. Merrell Dow Pharms., Inc.*, 851 F.2d 703, 705 (3d Cir.1988) (affirming trial court's disregard of an affidavit submitted "only after [plaintiff] faced almost certain defeat in summary judgment" because it "flatly contradicted no less than eight of her prior sworn statements" in deposition and answers to interrogatories concerning date she first ingested manufacturer's drug); *Franks v. Nimmo*, 796 F.2d 1230, 1236–37 (10th Cir.1986) (affirming trial court's refusal to consider an affidavit, submitted on motion to reconsider summary judgment, when that affidavit asserted discussions about a matter which, in prior deposition testimony, plaintiff had admitted "had not been discussed at all"); *Reid v. Sears, Roebuck & Co.*, 790 F.2d 453, 460 (6th Cir.1986) (affirming trial court's refusal to find an issue of fact on an employee's affidavit asserting that defendant's agent made oral promises at initial interview when "[e]ven in response to a leading question in her deposition [she] replied that no promise was made at the interview"); *Miller v. A.H. Robins Co.*, 766 F.2d 1102, 1104–05 (7th Cir.1985) (affirming grant of summary judgment on limitations issue under state's discovery rule because plaintiff's affidavit assertion that no doctor informed her of cause of injury was contradicted by three of her statements on deposition); *Barwick*, 736 F.2d at 959–60 (affirming grant of summary judgment when plaintiff testified extensively in two depositions concerning those asbestos products to which he had been exposed, and then submitted a conclusory affidavit, invalid under Fed.R.Civ.P. 56(e), as a "vain effort to create an issue of fact by general statements after three years of discovery had produced little or nothing as to the remaining defendants"); *Van T. Junkins & Assocs.*, 736 F.2d at 657 (affirming grant of summary judgment when plaintiff admitted on deposition in three places that "no one stated that he had to buy a building from [defendant] as a condition, a term, or a prerequisite to becoming a [franchise] dealer," but then stated in affidavit that he was so told, because "the affidavit constituted a sham"); *Camfield Tires, Inc. v. Michelin Tire Corp.*, 719 F.2d 1361, 1365 (8th Cir.1983) (affirming grant of summary judgment when, on deposition, plaintiff stated that defendant had followed his instructions as to presentation of check, but then on affidavit that defendant did not do so, because the issues raised on affidavit "were not genuine because the circumstances in this case do not suggest legitimate reasons [such as confusion at deposition] for [plaintiff's] filing of the inconsistent affidavit"); *Radobenko v. Automated Equip. Corp.*, 520 F.2d 540, 544 (9th Cir.1975) (affirming grant of summary judgment, and stating with respect to three factual issues raised by affidavit which contradicted deposition testimony that "we reject appellants' efforts to characterize them as *genuine* issues of fact").

specifying more precisely the circumstances under which a federal district court properly may disregard or strike a nonmoving party's contradictory affidavit. For example, in *Martin v. Merrell Dow Pharmaceuticals, Inc.*, 851 F.2d 703 (3d Cir.1988), the plaintiff sued the manufacturer of Bendectin alleging that birth defects had been caused by ingesting this anti-nausea drug. During the discovery period, the manufacturer attempted to establish the precise time at which the plaintiff began to take the drug, on the theory that only during a certain "critical period" could a defect develop. As the appellate court characterized this theory, which the plaintiff never disputed, "a defendant in a particular case may be able to demonstrate the absence of proximate cause by establishing the date of conception, the date of first ingestion, the type or types of birth defects, and the critical period of development for the affected organ or organs." *Id.* at 704. In her answers to interrogatories, plaintiff stated that she first filled a prescription for Bendectin on May 19, 1966, also the date of her visit to the doctor who prescribed the drug. On deposition, plaintiff testified that she began to experience nausea her second month of pregnancy and that she had not tried anything herself at home to alleviate the nausea before seeking medical treatment. When defendant moved for summary judgment on the ground that the May 19 date was after the critical period for the birth defects at issue, so that the drug could not have caused them, plaintiff submitted an affidavit in which she stated that she had taken Bendectin, left over from a prior pregnancy, from about the eleventh day after her pregnancy began, well before she sought medical treatment on

---

While the Fifth Circuit reversed a grant of summary judgment because "[i]n light of the jury's role in resolving questions of credibility, a district court should not reject the content of an affidavit even if it is at odds with statements made in an earlier deposition," *Kennett–Murray Corp. v. Bone*, 622 F.2d 887, 894 (5th Cir.1980), that case left open the possibility that the rule might apply in other contexts. Since then, the Fifth Circuit has cited the rule approvingly. *See Albertson v. T.J. Stevenson & Co.*, 749 F.2d 223, 228 (5th Cir.1984) ("[T]he nonmovant cannot defeat a motion for summary judgment by submitting an affidavit which directly contradicts, without explanation, his previous testimony.").

May 19. Plaintiff also filed an expert affidavit stating that, if she took Bendectin from the time alleged in her new affidavit, then the drug increased the risk of birth defects.

Affirming the district court's grant of summary judgment and disregard of this affidavit, the Third Circuit stated:

> "We recognize that there are situations in which sworn testimony can quite properly be corrected by a subsequent affidavit. Where the witness was confused at the earlier deposition or for some other reason misspoke, the subsequent correcting or clarifying affidavit may be sufficient to create a material dispute of fact. The case before us, however, does not present such a situation. The date of [plaintiff's] first ingestion of Bendectin, a fact of considerable importance, was the subject of repeated questioning. Plaintiff's affidavit, submitted only after she faced almost certain defeat in summary judgment, flatly contradicted no less than eight of her prior sworn statements:
>
> . . . .
>
> "Moreover, no explanation was offered in the affidavit for the contradictions. As a result, we conclude that it was permissible for the district court to disregard the affidavit for purposes of determining whether there was a material dispute of fact.
>
> "... When, as in the present case, the affiant was carefully questioned on the issue, had access to the relevant information at that time, and provided no satisfactory explanation for the later contradiction, the courts of appeals are in agreement that the subsequent affidavit does not create a *genuine* issue of material fact."

*Id.* at 705–06 (citation and footnote omitted).

Wright and Miller summarize the caselaw under Fed. R.Civ.P. 56 as follows:

> "Although some courts have ruled that conflicts between depositions and later-filed affidavits present questions of credibility, precluding summary judgment, several courts have suggested that summary judgment may be granted

under those circumstances, or that the affidavit may be disregarded or stricken as sham."

10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2726, at 448–50 (3d ed.1998) (footnotes omitted). Those authors then present the following evaluation:

"These decisions should not be interpreted too broadly, however. It seems quite clearly correct to conclude that an interested witness who has given clear answers to unambiguous questions cannot create a conflict and resist summary judgment with an affidavit that is clearly contradictory, without providing a satisfactory explanation of why the testimony is changed. If such an explanation is proffered, a credibility question is presented; without it, there are no facts suggesting why a credibility question exists and the nonmoving party should not be allowed to manufacture a question of fact to delay resolution of the suit. This conclusion may be challenged on the ground that the judge in disregarding the affidavit effectively is making a decision to disbelieve that ex parte testimony and that the judge's role on summary judgment is not to weigh or evaluate the evidence, but merely to rule on whether there is evidence to go to the jury. However, insofar as the courts always have agreed that credibility issues prevent summary judgment only when there are facts suggesting why credibility is at issue, it seems consistent with this approach to require the nonmoving party to do more than simply interpose an ex parte conflicting statement with the threat that false-swearing may lead to perjury charges and to present facts showing why this later assertion should be taken seriously. On the other hand, if the witness' answers in the deposition are not that clear or the questions are not that unambiguous, a later-filed affidavit may indeed create a genuine issue by supplying additional facts."

*Id.* at 452–53 (footnotes omitted).

V

Before addressing the sham affidavit issue, we address Respondents' argument that Petitioners violated the schedul-

ing order and its discovery cutoff by altering their position from that stated in discovery when they were faced with a motion for summary judgment. Here, as provided under Maryland Rule 2–504, the scheduling order fixed "a date by which all dispositive motions must be filed," Rule 2–504(b)(1)(E), and that date was after the date "by which all discovery must be completed." Rule 2–504(b)(1)(D). Rule 2–504's sequencing contemplates that the facts will be developed during discovery and that, based on that discovery record, the court will be able to determine whether a trial is necessary if a party seeks summary judgment. The summary judgment rule, however, expressly authorizes the filing of an affidavit in opposition to a motion for summary judgment. Rule 2–501(b). Rule 2–504 does not, and the scheduling order in this case could not, deprive Petitioners of that right under Rule 2–501(b).[11] Consequently, if an affidavit in opposition to a motion for summary judgment may be stricken on the ground that its factual content contradicts the affiant's deposition testimony, a court's authorization to do so seemingly must be found under Rule 2–501.

## VI

The sham affidavit rule is contrary to the way in which this Court's rule on summary judgment traditionally has been applied, because, in application, the sham affidavit rule requires a credibility judgment by the trial court. The federal cases find support for making a credibility judgment in the requirement for a grant of summary judgment under Fed. R.Civ.P. 56 that there be no "genuine" issue of material fact. For example, courts that have adopted the sham affidavit rule have said that "[t]he very object of summary judgment is to separate real and genuine issues from those that are formal or pretended, so that only the former may subject the moving

---

**11.** We express no opinion on what remedy might have been available to the Respondents, in the discretion of the court, if the Respondents had not moved for summary judgment and the changes in testimony had arisen for the first time at trial.

party to the burden of trial." *Radobenko v. Automated Equip. Corp.*, 520 F.2d 540, 544 (9th Cir.1975). *See also Camfield Tires, Inc. v. Michelin Tire Corp.*, 719 F.2d 1361, 1365 (8th Cir.1983) (characterizing asserted facts as "not genuine" because "the circumstances in this case do not suggest legitimate reasons for [the nonmoving party's] filing of the inconsistent affidavit").

An attempt to narrow the operation of the sham affidavit rule is found in *Tippens v. Celotex Corp.*, 805 F.2d 949 (11th Cir.1986), where the court said:

> "The purpose of summary judgment is to separate real, genuine issues from those which are formal or pretended. To allow every failure of memory or variation in a witness's testimony to be disregarded as a sham would require far too much from lay witnesses and would deprive the trier of fact of the traditional opportunity to determine which point in time and with which words the witness (in this case, the affiant) was stating the truth. Variations in a witness's testimony and any failure of memory throughout the course of discovery create an issue of credibility as to which part of the testimony should be given the greatest weight if credited at all. Issues concerning the credibility of witnesses and weight of the evidence are questions of fact which require resolution by the trier of fact. An affidavit may only be disregarded as a sham 'when a party has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact ... [and that party attempts] thereafter [to] create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony.' "

*Id.* at 953–54 (quoting *Van T. Junkins & Assocs.*, 736 F.2d at 657).

This attempt to constrict the scope of the sham affidavit rule nevertheless requires a court to make credibility determinations. For example, earlier that year, the Eleventh Circuit, in reversing a grant of summary judgment under its rule in *Van T. Junkins & Assocs.*, reasoned in part as follows:

"Here there is little chance of sham factual issues. [The affiant] is a disinterested witness and it is our view that any inconsistency in his testimony is more likely the result of his faulty memory than a predisposition to lie."

*Lane v. Celotex Corp.*, 782 F.2d 1526, 1530–31 (11th Cir.1986) (per curiam).

In distinguishing between a sham affidavit that may be disregarded and a correcting or clarifying affidavit that should be considered, the opinion in *Martin*, 851 F.2d 703, reflects that the following factors came into play: (1) whether an explanation is offered for the statements in the affidavit that contradict prior sworn statements; (2) the importance to the litigation of the fact about which there is a contradiction; (3) the frequency and carefulness of questions posed at deposition concerning this fact; (4) whether the nonmovant had access to this fact at or prior to the deposition; (5) the frequency and degree of variation between statements on deposition and statements made in the affidavit concerning this fact; (6) whether the deposition testimony indicates that the witness was confused at the time; (7) when, in relation to summary judgment, the affidavit is submitted. Factors identified by other courts include: (1) "whether the affiant was cross-examined during his earlier testimony," *Franks v. Nimmo*, 796 F.2d 1230, 1237 (10th Cir.1986); (2) whether the party "read the deposition, made several changes to correct inaccuracies and a possible misinterpretation," but did not include in these changes the contradictory assertion presented in the affidavit, *Miller v. A.H. Robins Co.*, 766 F.2d 1102, 1105 (7th Cir.1985); (3) whether "the affidavit assertion was . . . plausible." *Camfield Tires, Inc.*, 719 F.2d at 1365. These factors are the points that would be raised at trial on cross-examination of the nonmovant-deponent-witness and would be argued by the movant to the trier of fact as reasons to disbelieve the witness.

Maryland law, on the other hand, has not viewed the function of summary judgment to be determining whether an issue is genuine based on credibility. A summary judgment procedure was first adopted in Maryland on November 12,

1947, as § IV of the Law and Equity Rules of the General Rules of Practice and Procedure. *See* Maryland Code (1939, 1947 Cum.Supp.) at 2044. The explanatory notes of the Reporter to the Rules Committee at that time described the purpose of the summary judgment rule in these terms:

"The court does not, of course attempt to decide any issue of fact or of credibility, but only whether such issues exist. If the affidavits or other evidence show a genuine conflict, the court must deny the motion. Thus, the proposed procedure is not a substitute for a trial, but only a hearing to decide whether a trial is necessary. But the party opposing the motion must show by *facts* that there is a real dispute."

*Id.* at 2114.

▌ Judge Hammond, writing for the Court in *Frush v. Brooks,* 204 Md. 315, 321, 104 A.2d 624, 626 (1954), quoted the above explanation, and this Court has reiterated that purpose consistently thereafter. *See White v. Friel,* 210 Md. 274, 285–86, 123 A.2d 303, 308 (1956); *Tellez v. Canton R.R. Co.,* 212 Md. 423, 431, 129 A.2d 809, 813 (1957); *Howard Cleaners of Baltimore, Inc. v. Perman,* 227 Md. 291, 295–96, 176 A.2d 235, 237 (1961); *Wolfe v. Lamar & Wallace, Inc.,* 261 Md. 174, 178, 274 A.2d 121, 123 (1971). More recently, in *Goodwich v. Sinai Hospital of Baltimore, Inc.,* 343 Md. 185, 206, 680 A.2d 1067, 1077–78 (1996), we said of the court's role in deciding a motion for summary judgment that "in keeping with Maryland law, the trial judge is not allowed to weigh evidence," citing *Anderson v. Liberty Lobby,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202, 212 (1986).

▌ The test under Maryland law for determining whether no triable issue of fact is presented on summary judgment is highly analogous to whether a motion for judgment should be granted in a case tried to a jury. *See Berkey,* 287 Md. at 305, 413 A.2d at 171; *Honaker v. W.C. & A.N. Miller Dev. Co.,* 285 Md. 216, 232, 401 A.2d 1013, 1021 (1979); *Porter v. General Boiler Casing Co.,* 284 Md. 402, 413, 396 A.2d 1090, 1096 (1979); *Salisbury Beauty Sch. v. State Bd. of Cosmetologists,* 268 Md. 32, 41, 300 A.2d 367, 374 (1973). Thus, in order

for a nonmoving plaintiff to prevent the entry of summary judgment on grounds of factual conflict, "there must be evidence upon which the jury could reasonably find for the plaintiff." *Beatty v. Trailmaster Prods., Inc.*, 330 Md. 726, 739, 625 A.2d 1005, 1011 (1993). Phrased another way, the evidence presented by the nonmovant must be such as "would allow a reasonable fact-finder to conclude" that, in actuality, the facts were those most favorable to the nonmovant. *Chesapeake Pub. Corp. v. Williams*, 339 Md. 285, 299, 661 A.2d 1169, 1176 (1995). *See also Seaboard Sur. Co. v. Richard F. Kline, Inc.*, 91 Md.App. 236, 245, 603 A.2d 1357, 1361 (1992) (" '[T]here must be evidence on which the jury could reasonably find for the [nonmovant].' ") (quoting *Liberty Lobby*, 477 U.S. at 252, 106 S.Ct. at 2512, 91 L.Ed.2d at 214).

Applying this test in the sham affidavit area, one legal commentator has written:

> "[T]here are certain basic claims that witnesses might make that are not provably false but are so wildly implausible and unbelievable that no rational jury would be allowed to return a verdict on the basis of such testimony. These consist of claims and defenses that 'rise to the level of the irrational or the wholly incredible, whether or not there are judicially noticeable facts available to contradict them,' and they are no rarity in federal courts. For more than a century, our legal system has provided that a factual question will not reach a jury 'merely because some evidence has been introduced by the party having the burden of proof, unless the evidence be of such character that it would warrant the jury in finding a verdict in favor of that party.' The judge cannot discharge that responsibility unless he is willing, when necessary, to reject even the sworn claims of an eyewitness that are literally incredible—even on a motion for summary judgment."

J.J. Duane, *The Four Greatest Myths About Summary Judgment*, 52 Wash. & Lee L.Rev. 1523, 1581–82 (1995) (footnotes omitted) (quoting, respectively, *Denton v. Hernandez*, 504 U.S. 25, 33, 112 S.Ct. 1728, 1733, 118 L.Ed.2d 340, 350 (1992);

*Liberty Lobby, Inc.,* 477 U.S. at 251, 106 S.Ct. at 2511, 91 L.Ed.2d at 213).

 If the test stated above is satisfied, a Maryland court is presently authorized to disregard the otherwise admissible content of an affidavit in opposition to a motion for summary judgment. Application of that test to the contradictions and inconsistencies between Hall's deposition testimony and affidavit results in a reversal of summary judgment for the Respondents. A court, reading this paper trail, without seeing or hearing Hall and without the benefit of forming a firsthand impression as to her degree of intelligence, cannot conclude that a rational jury would reject as incredible the facts stated in Hall's affidavit. Reasonable persons, based on their real life experiences, may not be persuaded that Hall's failure to be consistent in dealing with the length of periods of time and when they began means that the testimony most favorable to the Petitioners cannot be believed.

## VII

 With due respect to our colleagues in the federal courts, we decline to change present Maryland law and adopt the sham affidavit rule. In addition to its inconsistency with present Maryland law, such a change in the summary judgment rule would impact other aspects of Maryland law. Further, there are ways, other than by striking the affidavit, in which the trial courts can deal with that which they firmly believe to be a sham affidavit.

## A

 Unlike Fed.R.Civ.P. 30(e), Maryland Rule 2–415(d) limits corrections by the deponent of a deposition to those that allegedly conform the transcript to the testimony. The Maryland rule does not expressly allow changes of substance. *See* note 5, *supra.* That rule seems to contemplate that any change in the deponent's testimony ordinarily will be made on the record for the first time at trial, where the deponent-witness can be cross-examined before the trier of

fact concerning the inconsistency.[12] At trial, when a witness testifies contrary to that person's deposition testimony, the court is not authorized, on motion of the adversary, to strike the testimony on the ground that it is a sham or to grant a motion for judgment because the trial testimony so contradicts the deposition testimony as to lack all probative value.[13] In *Brooks v. Daley*, 242 Md. 185, 218 A.2d 184 (1966), we affirmed the denial of a motion for judgment in the face of an argument that prior inconsistent statements deprived testimony of any probative weight, saying:

> "In two previous cases we specifically held that if 'inconsistency appears between statements in a pre-trial deposition and testimony at the trial, the weight and credibility of the testimony are for the jury.' *Safeway Trails, Inc. v. Smith*, 222 Md. 206, 215, 159 A.2d 823 (1960); *Campbell v. State*, 203 Md. 338, 100 A.2d 798 (1953)."

*Id.* at 192, 218 A.2d at 188.

Thus, adopting the sham affidavit rule would shift the credibility determination from the trier of fact at trial, where the trier of fact would have the benefit of observing the witness's demeanor on cross-examination, to the trial court on summary judgment, where the trial court would be limited to a paper record. Further, were the sham affidavit rule incorporated into Maryland summary judgment practice, some accommodation would have to be made in the deposition rules for the witness who genuinely has a refreshed recollection, in order to permit that deponent formally to place the change on

---

**12.** Trial counsel are, of course, free to advise their adversaries of an anticipated change on a material fact from deposition testimony by a client-deponent, and, indeed, may consider it good tactics to do so.

**13.** We do not intend to imply that at trial the adversary may not obtain some other remedy to counterbalance prejudicial surprise, depending on the circumstances. *See, e.g., Bartholomee v. Casey*, 103 Md.App. 34, 50, 651 A.2d 908, 915 (1994) (holding that trial court abused its discretion in admitting, over objection, testimony "which flatly contradicted plaintiffs' answers to interrogatories" because this testimony constituted "the kind of unfair surprise that ... the discovery process was intended to avoid"), *cert. denied*, 338 Md. 557, 659 A.2d 1293 (1995).

record before a motion for summary judgment was filed. As our rules are presently structured, deponents who have honestly concluded that their deposition testimony was in error have no formal opportunity, prior to a motion for summary judgment, to go on record with the change. Under the present practice, were a sham affidavit rule adopted, without other changes, the party-deponent-affiant is placed in the position of appearing to have generated the change in testimony only as a response to the threatened entry of summary judgment against that party.

It may be possible, of course, for this Court to adopt a form of sham affidavit rule under which the affidavit would be stricken unless the affiant presented in the affidavit the reasons for the change in testimony. That was not done here. Such a rule, however, merely inserts another layer into the analysis, but it does not remove the underlying credibility issue. If this version of a sham affidavit rule required the court to weigh the validity of the explanation, then the credibility determination simply would be moved to another level. If the rule required the court to accept the explanation, those who are disposed to submit a sham affidavit would simply add a sham reason in order to defeat summary judgment, and the result would not differ from having no sham affidavit rule at all. The trier of fact at trial would still determine the truth of the factual matter that had been set forth in the affidavit.

In any event, the principal deterrent to the sham affidavit is its substantial undermining of the credibility of the nonmovant when testifying at trial and the increased risk to the nonmovant of losing the case on the merits. The sham affidavit is, almost by definition, an act of desperation. It is filed to stave off an imminent summary judgment in the hope that the movant will settle to avoid the cost of trial. If we were to adopt the sham affidavit rule in order to address what may be a relatively small number of cases in which sham affidavits are presented, the downside possibly would be an increase in the filings of summary judgment motions that are based on an attempt to convince the trial court that some variation in the nonmovant's affidavit was completely and inexplicably contra-

dictory, and that the variation was not simply a clarification or elaboration. If a need develops for a sham affidavit rule, that need ordinarily would be discerned initially by our Standing Committee on the Rules of Practice and Procedure. That committee also would be in the position to recommend appropriate adjustments in other Rules of Procedure if the trial courts were given the discretion under Rule 2–501 to strike a sham affidavit.

B

There are means other than striking that are available to a trial court for dealing with that which the court is convinced is a sham affidavit. The federal sham affidavit rule in theory applies only when there is a flat contradiction of material fact between the deposition testimony and the affidavit opposing summary judgment. If the trial court is convinced that the affidavit is demonstrably knowingly false, one course of action is to refer the matter to the prosecutor for possible perjury charges. Maryland Code (1957, 1996 Repl. Vol.), Article 27, § 437 specifically contemplates perjury prosecutions based on contradictory statements.[14]

Further, if, at trial, the fact-finder rejects the version of the facts set forth in the nonmovant's affidavit, and if the court is convinced that the affidavit was a sham, designed merely to forestall summary judgment and to prolong the possibility of effecting some settlement, then "the offending party or the attorney advising the conduct or both of them" may be required to pay costs and reasonable expenses, including

---

14. Article 27, § 437 reads as follows:
"**Contradictory statements.**
"Any person who shall make oath or affirmation to two contradictory statements, each of them in one of the cases enumerated in § 435 and in either case shall make oath or affirmation wilfully and falsely, shall be deemed guilty of perjury; and to sustain an indictment under this section it shall be sufficient to allege and prove that one of the said two contradictory statements is or must be false and wilful, without specifying which one."
Section 435 includes "all affidavits or affirmations made pursuant to the Maryland Rules."

attorney's fees, under the sanction rule, Rule 1–341. Surely, if the affidavit is demonstrated to be clearly a sham, a claim or defense asserted therein which has been rejected by the fact-finder would be a claim or defense asserted in bad faith or without substantial justification.

Another way of dealing with an apparent sham affidavit would utilize the "catchall" power under Rule 2–504(b)(2)(G) which permits the court to order "any other matter pertinent to the management of the action." Under this option the court could sever the issue of material fact involved in the contradictory statements for trial as a separate issue, thus presumably sparing the moving party the expense of a full trial.

## VIII

The dissent in this case does not embrace fully the federal sham affidavit rule. Instead, the dissent would apply an analysis of internally contradictory trial testimony that was applied in *Kucharczyk v. State*, 235 Md. 334, 201 A.2d 683 (1964).

The facts and holding in *Kucharczyk* were succinctly stated in *Smith v. State*, 302 Md. 175, 486 A.2d 196 (1985), where we said:

> "In *Kucharczyk*, the defendant was convicted of assault and battery, based on the alleged attempted buggery of a sixteen year old boy. The prosecuting witness's testimony furnished the only evidence against the defendant. This witness was mentally deficient and, according to a psychologist called by the State, had a full scale I.Q. of only 56. The witness, twice on direct examination and once on cross-examination, 'testified that nothing happened. Thus, there were unqualified statements by the prosecuting witness that the crime for which the appellant was convicted never in fact occurred.' 235 Md. at 337–38, 201 A.2d 683. On this ground, the Court reversed the conviction, stating that
> > " 'the testimony of the prosecuting witness, who was the only person that testified as to any overt act on the part

of the appellant, was so contradictory that it lacked probative force and was thus insufficient to support a finding beyond a reasonable doubt of the facts required to be proven.' [*Kucharczyk*, 235 Md.] at 337, 201 A.2d 683." *Smith*, 302 Md. at 182, 486 A.2d at 199. In support of its conclusion, the *Kucharczyk* Court cited *Kaufman v. Baltimore Transit Co.*, 197 Md. 141, 145, 78 A.2d 464, 466 (1951), *Eisenhower v. Baltimore Transit Co.*, 190 Md. 528, 537, 59 A.2d 313, 318 (1948), and *Slacum v. Jolley*, 153 Md. 343, 351, 138 A. 244, 248 (1927). *Kucharczyk*, 235 Md. at 338, 201 A.2d at 685. These cases also are cited in the dissent in the instant matter.

*Slacum*, the seminal case, presented a claim under the Workers' Compensation Act for benefits due to death allegedly caused by exposure to heat in the decedent's employment as a bus operator. The claimant's medical experts "stated positively that they could not say what caused [the decedent's] death," but one of those also had said that "from 'all the evidence and the facts which were presented after his death' [the decedent] died from heat prostration." *Id.* at 351, 138 A. at 248. *Slacum* held the latter evidence insufficient to present a jury issue.

*Smith* involved an accused whose testimony was substantially muddled as to whether he was in Texas or in Maryland at the time of the commission of the robbery with which he was charged. We held that it was error to deny the accused an alibi instruction and that the error was not harmless inasmuch as the accused's testimony was not without evidentiary value under the *Kucharczyk* analysis. We said that the latter "is extremely limited in scope," *Smith*, 302 Md. at 182, 486 A.2d at 199, and that the principle set forth by *Kucharczyk* has a "narrow ambit." *Id.* at 183, 486 A.2d at 200.

Judge Moylan, writing for the Court of Special Appeals in *Bailey v. State*, 16 Md.App. 83, 294 A.2d 123 (1972), placed the *Kucharczyk* holding in perspective with the following review:

"Despite the limited utility of the doctrine, the life of *Kucharczyk* has been amazing for the number of occasions

on which and the number of situations in which it has been invoked in vain. *Kucharczyk* does not apply simply because a witness's trial testimony is contradicted by other statements which the witness has given out of court or, indeed, in some other trial. *Brooks v. Daley,* 242 Md. 185, 191–192 [218 A.2d 184 (1966) ]; *Edwardsen v. State,* 243 Md. 131, 137–138 [220 A.2d 547 (1966) ]; *Wilson v. State,* 261 Md. 551, 556–558 [276 A.2d 214 (1971) ]; *Alexander v. State,* 4 Md.App. 214, 218 [242 A.2d 180 (1968) ]; *Moore v. State* 7 Md.App. 495, 502 [256 A.2d 337 (1969) ]; *Jones v. State,* 10 Md.App. 420, 428 [270 A.2d 827 (1970) ]; *Tumminello v. State,* 10 Md.App. 612, 616 [272 A.2d 77 (1971) ]; *Sun Cab Company v. Carter,* 14 Md.App. 395, 407 [287 A.2d 73 (1972) ]. Nor does *Kucharczyk* apply where a witness's trial testimony contradicts itself as to minor or peripheral details but not as to the core issues of the very occurrence of the *corpus delicti* or of the criminal agency of the defendant. *Bell v. State,* 2 Md.App. 471, 472 [235 A.2d 307 (1967) (per curiam) ]; *Poff v. State,* 3 Md.App. 289, 292–293 [239 A.2d 121 (1968) (per curiam) ]; *Chesley v. State,* 3 Md.App. 588, 596 [240 A.2d 342 (1968) ]; *Eley v. State,* 4 Md.App. 230, 234 [242 A.2d 175 (1968) (per curiam) ]; *Rasnick v. State,* 7 Md.App. 564, 568 [256 A.2d 543 (1969) ]; *Lindsay v. State,* 8 Md.App. 100, 103 [258 A.2d 760 (1969) ]; *Gardner v. State,* 8 Md.App. 694, 700–701 [261 A.2d 799 (1970) ]; *Dorsey v. State,* 9 Md.App. 80, 87 [262 A.2d 591 (1970) ]; *Pinkney v. State,* 9 Md.App. 283, 295 [263 A.2d 871 (1970) ]; *Hunt v. State,* 12 Md.App. 286, 292 [278 A.2d 637 (1971) ]; *Crenshaw v. State,* 13 Md.App. 361, 372 [283 A.2d 423 (1971) ]. Nor does *Kucharczyk* apply where the testimony of a witness is 'equivocal, doubtful and enigmatical' as to surrounding detail. *Thompson v. State,* 5 Md.App. 191, 196–197 [245 A.2d 903 (1968) ]. Nor does *Kucharczyk* apply where a witness is forgetful as to even major details or testifies as to what may seem improbable conduct. *Gunther v. State,* 4 Md.App. 181, 184–185 [241 A.2d 907 (1968) (per curiam) ]. Nor does *Kucharczyk* apply where a witness is initially hesitant about giving inculpatory testimony but

subsequently does inculpate a defendant. *Wilkins v. State,* 239 Md. 692, 693 [211 A.2d 308 (1965) (per curiam)]. Nor does *Kucharczyk* apply where a witness appears initially to have contradicted himself but later explains or resolves the apparent contradiction. *Wilson, Valentin and Nutter v. State,* 8 Md.App. 653, 674 [262 A.2d 91 (1970)]. Nor does *Kucharczyk* apply where a State's witness is contradicted by other State's witnesses. *Scott v. State,* 2 Md.App. 709, 713–715 [237 A.2d 61 (1968)]; *Tillery v. State,* 3 Md.App. 142, 148 [238 A.2d 125 (1968) (per curiam)]; *Gunther v. State, supra; Hunt v. State, supra.* Nor does *Kucharczyk* apply where a State's witness is contradicted by defense witnesses. *Johnson v. State,* 3 Md.App. 219, 222 [238 A.2d 295 (1968) (per curiam)]. Nor does *Kucharczyk* apply where a witness does contradict himself upon a critical issue but where there is independent corroboration of the inculpatory version. *Tucker v. State,* 237 Md. 422, 424 [206 A.2d 691 (1965)]; *Chesley v. State, supra,* [at] 596 [240 A.2d 342]. In each of those situations, our system of jurisprudence places reliance in the fact finder to take contradictions or equivocations properly into account and then to make informed judgment in assessing a witness's credibility and in weighing that witness's testimony. Even in a pure *Kucharczyk* situation, the ultimate resolution is solely in terms of measuring the legal sufficiency of the State's total case and not in terms of the exclusion of the contradictory witness's testimony."

*Id.* at 95–97, 294 A.2d at 130–31.

From the time that Judge Moylan wrote *Bailey* to date, no opinion of this Court or of the Court of Special Appeals has encountered a set of facts that justified applying the *Kucharczyk* approach. Indeed, *Vogel v. State,* 315 Md. 458, 554 A.2d 1231 (1989), quoted with approval the following passage from *Bailey,* 16 Md.App. at 93, 294 A.2d at 129:

" 'Trial testimony frequently is replete with contradictions and inconsistencies, major and minor. It is the quintessential approach of the Anglo–American trial system to rely

fundamentally upon cross-examination, upon the introduction of prior inconsistent statements, upon impeachment devices generally, upon sequestration, upon oral argument to ferret out and to highlight such contradictions if and when they exist.' "

*Vogel,* 315 Md. at 471 n. 6, 554 A.2d at 1237 n. 6.

Although the more recent Maryland cases that have rejected an argument that contradictory evidence is legally insufficient have been criminal cases, the restrictions that Maryland appellate courts have put on the reach of *Kucharczyk* in criminal cases would seem to apply with greater force in civil cases. Inasmuch as the standard of proof in civil cases is lesser than in criminal, internally contradictory trial testimony should less readily be found legally insufficient in civil than in criminal matters.

The dissent in the instant matter would extend *Kucharczyk.* We read the dissent to advocate that the conflict between Hall's affidavit and her deposition testimony renders both of no probative value. *Kucharczyk,* on the other hand, deals only with testimony at trial and with the effect on legal sufficiency of substantial contradictions within the trial testimony of a single witness on whose testimony the entire claim or defense depends. Thus, if Hall testified at trial in a manner consistent with her affidavit in opposition to summary judgment, but inconsistent with her deposition, that trial testimony could not be stricken because of the inconsistency. *See Brooks,* 242 Md. at 192, 218 A.2d at 188. Although Hall may be subject to a bloodying impeachment on cross-examination at trial, based on her prior inconsistent statements, testimony consistent with her affidavit would remain in the case. Thus, remarkably, the dissent would combine *Kucharczyk* with the summary judgment rule to eliminate at the summary judgment stage evidence which would be admissible at trial.

## IX

For all of the foregoing reasons we decline to adopt the sham affidavit rule of the federal courts. Instead, we apply

Maryland's traditional summary judgment law. Accordingly, the judgment is reversed.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED. CASE REMANDED TO THAT COURT FOR THE ENTRY OF A JUDGMENT REVERSING THE JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY AND REMANDING THIS ACTION TO THAT COURT FOR FURTHER PROCEEDINGS. COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS TO BE PAID BY THE RESPONDENTS, ATLANTIC REALTY COMPANY AND NORTHERN BROKERAGE CO.**

### Appendix

The following exchange took place between counsel for a co-defendant of Respondents and Hall concerning the latter's residence at and visits to the subject premises:

"Q: When did you stay with Rita Porter?

"A: Like right after I had my son. He was like two. My mother put me out [of the Harlem Avenue residence] and I went around there and stayed with her.

"Q: So Terran was about two years old?

"A: Yes.

"Q: And you went and stayed with Rita Porter?

"A: Yes.

"Q: How long did you stay with her?

"A: About a month.

"Q: Why did your mother put you out of the house?

"A: She was in one of her little deranged stages, and I just got tired of going through it, so she said get out, then. And I took my son and I got out.

"Q: How long did you stay with Miss Porter?

"A: About two weeks. Two months I mean.

"Q: Two months. And where did she live?

"A: 1908 Lauretta Avenue.

"Q: Say that again.

"A: 1908 Lauretta Avenue.

"Q: Okay. Other than staying with her for about two months when Terran was about two years old, did you ever stay with her any other times?

"A: Well, after I stayed with her, then I went back home to my mother.

"Q: Okay. Did you ever go back to staying at her house?

"A: I was staying with her while I was pregnant, for one. I was staying with her while I was pregnant.

"Q: Pregnant with who?

"A: Terran.

"Q: Any other times?

"A: No, just them two times.

"Q: How long did you stay with her while you were pregnant?

"A: For about two, three months. Me and Terran, Sr., yeah, was staying there about two or three months.

"Q: Did Miss Porter ever baby-sit Terran?

"A: Yeah, here and there, she baby-sit him.

"Q: Okay. From the time Terran was about a year old to the time he was about four years old, how often would he visit Miss Porter?

"A: You say from one to four [years old]?

"Q: Correct.

"A: I go around there quite often, you know, I would go stop in and sit for a while quite often. You know, I was living on Harlem Avenue and she lived right around the corner from us, so I would stop in there quite often.

"Q: How many times a week or how many times a month, if you know?

"A: Maybe like, probably like twice out of a week or something like that, out of a month, who knows. I'd just drop in, you know.

"Q: Did she ever—did she ever baby-sit Terran on a regular basis, like an all day kind of thing?

"A: No."

When similarly questioned by counsel for Respondents, Hall responded as follows:

"Q: And you stayed in this house [at 1908 Lauretta Avenue] for a couple—

"A: For about two months. Yes, my mother put me out.

"Q: And can you remember exactly when that was that she put you out?

"A: The time, the date?

"Q: Yeah, like the time of the year.

"A: Ah, man.

"Q: What the weather was like, so you can pinpoint the time of year.

"A: It was like in the fall, probably.

"Q: Okay. Do you remember what year it was?

"A: My son was two.

"Q: He was two. You know he was definitely two?

"A: Or getting ready to turn two. It was somewhere around that area.

"Q: Okay. And then you stayed for a couple of months?

"A: (Nodding head affirmatively.)"

Shortly later this exchange occurred:

"Q: And when is it that you moved back [from the subject premises]? Do you remember a date or a time or an event that would kind of help pinpoint that?

"A: I know it was getting close to a holiday because I had to buy [Terran] an outfit to wear or something. Let me see what holiday was it. Was it Easter or was it the Fourth of July? It might have been Easter or the Fourth of July. I'm trying to think. Because it was spring when I was around there. Easter is in the spring, right? Right. I think I had to buy him an Easter outfit, so that's how I had to figure I went back home to my mom.

"Q: We were trying to figure out when you moved out—

"A: And I'm still trying to figure out.

"Q: Let me ask this. You said you thought it was possibly before he turned two, because his birthday would have been in December?

"A: December, right.

"Q: Well, do you think it was before December or after December that you moved in with [Porter]? You think it was before his birthday or after his birthday?

"A: . . . [I]t was before his birthday.

"Q: So before December of '92?

"A: Right. It was before his birthday.

"Q: And do you think the holiday—

"A: And I moved back—because I had to give him something for Easter. You say give you an event that makes it noticeable.

"Q: Would that maybe have been Christmas? If you moved out before his birthday, then the holiday might have been Christmas?

"A: It was after his birthday, so I was probably there like January, February, because it wasn't too bad outside. And I moved, it was after his birthday, that I do know. And I think I had to buy him an outfit for Easter.

"Q: Okay. . . . [Y]ou said you think you had occasionally went by to see [Porter] after that?

"A: I did. Yeah, I still went by and seen her.

"Q: And how often would you say you did that?

"A: About three or four times a week.

"Q: Okay. You had told—

"A: Maybe two [times a week]—

"Q: You told [counsel for a co-defendant]—

"A: She asked me how many times out of a month. I said, two or three times out of a week. Put it to you like this: Whenever [Gladys Hall] had something to drink, I was around there [at the subject premises], put it to you like that. And she had that, like, constantly. But I would take a break here and there.

"Q: All right. So when you would go by, would it be in the evenings so that you two could socialize?

"A: Evening, mornings, didn't matter.

"Q: Did you bring Terran with you?

"A: I took my baby with me everywhere I went.

"Q: And how long would you be there with [Porter]?

"A: Like two hours, three hours, maybe an hour.

. . . .

"Q: Okay. I just want to know if you continued to go visit her over the next few months or the next year or—

"A: Yes. I never stopped going to see her because I moved back with my mom. I still go see her."

Finally, another counsel for Respondents questioned Hall, and this exchange occurred:

"Q: Miss Hall, I'm confused about the time period when you—

"A: When I moved?

"Q: when you moved in with Miss Porter. First of all, can we just figure out how long did you live with Miss Porter.

"A: About two months.

"Q: About two months?

"A: Yes.

"Q: Now, you said that you paid rent to Miss Porter?

"A: Right.

"Q: Do you remember how long you paid her rent?

"A: That's why I said about two months, because I know how many times I gave her some money for rent money.

"Q: Which was twice?

"A: Which was twice.

"Q: So although you're not sure when you moved in, you know it was for—it was not for more than two months, because you only paid two months' rent?

"A: Right.

"Q: So two months is the maximum that you lived with her?

"A: Right, yes."

WILNER, Judge, dissenting.

With respect, I dissent. Although I do not necessarily agree with every statement or reason given by the various Federal courts in support of the "sham affidavit" rule, I do believe that, if carefully circumscribed, it is a reasonable and useful approach to protecting both the summary judgment procedure and our case management system against blatant fraud. I would hold, in this case, that the trial court had discretion to strike the two affidavits submitted in opposition to the motion for summary judgment, that it did not abuse its discretion in so doing, and that, on the remaining record presented to the court for purposes of the motion, it did not err in granting the motion.

Judge Rodowsky has accurately presented the underlying facts. Although Shari Hall's deposition testimony, as a whole, was not a model of clarity—a fact that has independent significance—she very clearly did make two points most relevant to this case: (1) that she and her son lived at 1908 Lauretta Avenue for only about two months between December, 1992 and February, 1993, and (2) while living with her mother at 1805 Harlem Avenue, she visited the Lauretta Avenue home, to visit her friend, Rita Porter, at the most three to four times a week for periods of about three hours. Whenever Ms. Hall strayed from that testimony or injected some ambiguity as to the extent of her contact with the Lauretta Avenue property, counsel attempted to pin her down, and she returned to her statement that she resided there for only about two months and had limited contact when not residing there. It was on that premise that Dr. Klein opined that it was unlikely that any lead paint at the Lauretta Avenue property was a major contributor to Terran Pittman's elevated lead levels.

Ms. Hall's later affidavit, claiming that she and her son resided full-time at the Lauretta Avenue property for five-

and-a-half months and that, when not residing there, she and her son visited the property every day of the week for eight hours a day, is flat-out inconsistent with her deposition testimony. The difference is not one of nuance, of refreshed memory, of new information that would lead to a different conclusion, or of incidental fact. It is a complete and unexplained change of story—of the central facts most relevant to her right to recover. What is perhaps more disturbing is that, in contrast to the rambling nature of her deposition testimony, the affidavit has a polished quality to it, suggesting that it was drafted by counsel and was not merely a recording of her own statements.

As the Court correctly points out, the function of summary judgment procedure is solely to determine whether a triable issue exists. The trial court does that by examining the evidentiary material presented in support of or in opposition to the motion in a light most favorable to the non-movant and deciding whether, if a trier of fact were to credit that evidence, so viewed, it could reasonably and lawfully reach a verdict on the issue in favor of the non-movant. *See Beatty v. Trailmaster*, 330 Md. 726, 738–39, 625 A.2d 1005, 1011–12 (1993). If the answer is "no," the court may, and usually should, enter a summary judgment, for there is nothing to be tried.

Summary judgment procedure is not a substitute for trial, but it does play an important role in weeding out cases, claims, or issues that investigation shows have no merit. Although the device of summary judgment was viewed with some skepticism when initially introduced into the Federal Rules of Civil Procedure, given the need for efficiency in handling the burgeoning civil dockets of our trial courts, appellate courts throughout the country have, in recent years, begun to look more favorably on the proper role summary judgments play in that winnowing process. The Federal courts, led in some respects by the Supreme Court, have taken the lead in unshackling summary judgment and allowing it to remove cases from the docket that would otherwise eventually be resolved on a motion for judgment during or after trial. Because our summary judgment rule was derived from the Federal rule,

we have almost always regarded Federal practice and interpretations as persuasive in the interpretation of our rule. *See Frush v. Brooks*, 204 Md. 315, 104 A.2d 624 (1954); *Metropolitan Mtg. Fd. v. Basiliko*, 288 Md. 25, 415 A.2d 582 (1980); *Beatty v. Trailmaster, supra*, 330 Md. at 738 n. 8, 625 A.2d at 1011 n. 8.

A summary judgment may be entered at any time—even during trial—but our rules contemplate that motions for summary judgment be made and decided before trial, usually upon completion of discovery. Maryland Rule 2–504 generally requires that a scheduling order be entered in every civil action in the circuit courts and further requires that such an order contain, among other things, "a date by which all discovery must be completed," and "a date by which all dispositive motions must be filed." This is so that, if a case is going to be disposed of on motion, either to dismiss or for summary judgment, the disposition occur as early in the litigation as practicable—that the case not continue to remain on the docket longer than necessary, in competition with other cases needing scarce trial dates.

For the system to work efficiently, as intended, the relevant record upon which the court is to act must be closed as of a certain point, and the court must be able to rely on the evidence presented in that record. That is why the date set in a scheduling order for the filing of motions for summary judgment is later than the date set for completing discovery— so the parties can develop the record and collate, edit, and present it in a way that is relevant to the issues to be raised in the summary judgment proceeding. It is why Rule 2–501 requires that the evidence presented in connection with the motion be supported by affidavit made on personal knowledge by persons competent to testify. It is why, in 1991, we eliminated the trap of allowing anything hidden in some pleading, deposition, or answer to interrogatory to defeat summary judgment and limited the record for summary judgment purposes to those facts presented in the motion or the response. The movant, the non-movant, and the court must be entitled to rely upon the information that is at hand when

the motion is filed and responded to—the information developed largely through discovery.

The Court rejects the "sham affidavit" approach because of its concern that adopting that approach would improperly allow the court, on summary judgment, to resolve conflicting evidence and make credibility assessments, which are matters for the trier of fact to determine. I share that concern, which is why I do not accept some of the language used and some of the decisions made by the Federal courts. I do not believe that a judge, on summary judgment, should be generically elevating deposition testimony over affidavits or answers to interrogatories or deciding which of two conflicting statements is correct. There are circumstances, however, in which a witness's testimony, whether presented at trial or, I believe, in connection with a summary judgment motion, is so internally conflicting on a material issue that the testimony in conflict lacks any probative force and is therefore disregarded. As far back as *Slacum v. Jolley,* 153 Md. 343, 351, 138 A. 244, 248 (1927), we held that "[w]hen a witness says in one breath that a thing is so, and in the next breath that it is not so, his testimony is too inconclusive, contradictory, and uncertain, to be the basis of a legal conclusion." *See also Oberfeld v. Eilers,* 171 Md. 332, 189 A. 203 (1937); *United States Fid. & Guar. Co. v. Continental Baking Co.,* 172 Md. 24, 190 A. 768 (1937); *Askin v. Long,* 176 Md. 545, 6 A.2d 246 (1939); *Butler v. Reed–Avery Co.,* 186 Md. 686, 48 A.2d 436 (1946); and *Eisenhower v. Baltimore Transit Co.,* 190 Md. 528, 59 A.2d 313 (1948), where we actually applied that doctrine. In *Kaufman v. Baltimore Transit Co.,* 197 Md. 141, 145, 78 A.2d 464, 466 (1951), we observed:

> "If the testimony of one witness at the trial is legally sufficient, it matters not that this testimony may be contradicted by ten witnesses . . . or even that it may be in conflict with statements before the trial, or testimony in a previous trial or other legal proceeding, of the same witness. [citations omitted]. But if any witness's testimony is itself so contradictory that it has no probative force, a jury cannot be

invited to speculate about it or to select one or another contradictory statement as the basis of a verdict."

*See also Kucharczyk v. State,* 235 Md. 334, 201 A.2d 683 (1964); *Foble v. Knefely,* 176 Md. 474, 6 A.2d 48 (1939); *Branch v. State,* 305 Md. 177, 502 A.2d 496 (1986) (Eldridge, J., dissenting).

The *Kaufman* analysis illustrates the point of my disagreement with the majority. When the contradiction is between trial testimony and pre-trial statements, the conflict or inconsistency affects only the credibility of the trial testimony, which is for the trier of fact to resolve. When, however, the testimony contemporaneously presented to a tribunal is itself in such contradiction that both versions cannot be true, the testimony has no probative force and cannot be the basis of a verdict. In that latter circumstance, it is not a matter of making credibility determinations or deciding disputed fact; all of the testimony in conflict is disregarded as non-probative, and the court looks only to what is left. Under the rule established in the aforecited cases, if a plaintiff, at trial, swears in one breath that the light was red for her, which would destroy her right of recovery, she cannot defeat a motion for judgment by swearing in the next breath and without any explanation, that the light was green. Because of the contradiction, neither statement is regarded as probative.

The same principle should apply in a summary judgment proceeding. As noted, the issue there is usually whether the record before the court contains sufficient evidence, if believed, to support a verdict for the non-movant. If, on that record, the only testimony that could support such a verdict is so self-contradictory as to be non-probative, it must be disregarded, just as it would be at trial. Certainly, if the contradiction appeared in a single document offered in opposition to the summary judgment—either deposition testimony or an affidavit—all of the averments in conflict would be treated as non-probative and disregarded.

The wrinkle in this case is that, with what appears to be the post-deposition counseling of an attorney, the plaintiff at-

tempted to inject the contradiction through another document. I quite agree with the Court that she was entitled to file an affidavit in opposition to the motion for summary judgment; the filing of an affidavit is not precluded by the scheduling order or by Rule 2–504. What is not allowed, however, is to use the affidavit to present a dramatic change in her sworn testimony, without any explanation. As noted in *Martin v. Merrell Dow Pharmaceuticals, Inc.*, 851 F.2d 703, 705 (3d Cir.1988), there *are* situations in which sworn testimony can quite properly be corrected by a subsequent affidavit. If the witness was confused on the earlier occasion, did not have complete information at the time, confesses in good faith to having simply been mistaken, or offers some other reasonable explanation for the change in testimony, the subsequent statement should be allowed, its effect then being for the trier of fact to gauge. In the absence of any such explanation, however, the court is left only with the proffered contradiction which, if allowed, would render all of the testimony in conflict non-probative.

The issue before us is largely one of law, but it embodies a certain discretionary element as well. When there is an *unexplained* contradiction in testimony on a critical issue— *i.e.*, the witness has, in fact, actually given conflicting evidence—we have tended to view the effect of the conflict in terms of the legal sufficiency of the evidence and thus as a question of law. When the issue is whether to permit conflicting evidence, however, a measure of discretion is necessary. The court can solicit or require an explanation, in order to make a determination whether the conflict is such as to render the testimony non-probative. If the witness were to be candid and state that he/she has changed the story because he/she is now convinced that victory would be otherwise unobtainable, the court would certainly have discretion to disallow the new testimony. If, on the other hand, the witness gives at least a creditable, even if not entirely credible, explanation, the court should allow the new evidence and let the trier of fact resolve the conflict.

Applying this long-established principle to summary judgment proceedings does not intrude upon the prerogatives reserved to the trier of fact. It is a reasonable thing to do; it follows the approach not only of the Federal courts but that of several other States;[1] it promotes the utility of summary judgment procedure; and it provides a necessary defense against sharp practice and fraud. In this case, the trial court did not err, in my view, in regarding the last-minute affidavits as an improper end-run around the scheduling order, the underlying case management system, and established summary judgment procedure—as a blatant attempt to reconstruct sworn testimony solely for the purpose of defeating summary judgment and forcing a trial. I would affirm the judgment of the Court of Special Appeals.

Judges RAKER and CATHELL have authorized me to state that they join in this dissenting opinion.

---

1. *See Hanna v. Cloud 9, Inc.,* 889 P.2d 529 (Wyo.1995); *Robinson v. Hank Roberts, Inc.,* 514 So.2d 958 (Ala.1987); *Mays v. Ciba–Geigy Corp.,* 233 Kan. 38, 661 P.2d 348 (1983); *Ellison v. Anderson,* 74 So.2d 680 (Fla.1954); *Jordan v. State Farm Insurance Co.,* 515 So.2d 1317 (Fla.Dist.Ct.App.1987); *Nutt v. A.C. & S. Co.,* 517 A.2d 690 (Del.Super.Ct.1986); *Wachovia Mortgage Co. v. Autry–Barker–Spurrier Real Estate, Inc.,* 39 N.C.App. 1, 249 S.E.2d 727 (1978), *affirmed by* 297 N.C. 696, 256 S.E.2d 688 (1979).